[No. 56656–9. En Banc. December 6, 1990.]

ORVILLE L. BERG, ET AL, *Individually and as Trustees, Petitioners,* v. DAVID HUDESMAN, ET AL, *Respondents.*

*Bannister, Clark, Taylor & Wallace,* by *Jack R. Wallace,* for petitioners.

*Paul R. Cressman, Sr., Michael R. Garner,* and *Short Cressman & Burgess; David Hancock* and *Smith, Smart, Hancock, Tabler & Middlebrooks,* for respondents.

BRACHTENBACH, J.—This suit concerns a 99–year ground lease. The main issue is the meaning of the rent payment clause. The trial court granted summary judgment to the landlord, held that the lease was not ambiguous, determined the meaning of the rental clause, and awarded back rent to the landlord based upon the trial court's interpretation of the rental clause. By unpublished opinion, the Court of Appeals affirmed in the main but remanded for determination of certain facts which existed at the inception of the lease. We reverse the trial court, modify the Court of Appeals opinion, and remand for trial.

The ground lease, executed in 1959, terminates in 2058. The ground tenant, defendant, removed a residence from the property, as allowed by the lease agreement, and constructed a commercial building on the land. This commercial building was originally leased to Safeway Stores for 15 years. Upon Safeway's removal, the tenant converted the building to a small shopping center which was subleased to a number of tenants during the period at issue.

In August 1987, the landlord brought the present suit, contending that for several years the defendant incorrectly calculated the rent due the landlord under the ground lease.

As will be seen, the rent due the landlord under the ground lease is calculated with respect to what constitutes "gross rentals" from the subtenants and what may be

deducted therefrom to ascertain "net rentals." "Net rentals" is the amount to which a formula set out in the ground lease applies for division of income between the landlord and the tenant, the parties in this suit.

The lease contains the following provision:

(3) <u>Rental</u>. The rental shall be Five Thousand and No/100 Dollars ($5,000.00) per year, payable in advance on or before the 19th day of October, 1959, of each year during the term of this lease. Receipt of Five Thousand and No/100 Dollars ($5,000.00) paid as rental for the first year of said term is hereby acknowledged.

It is expressly provided that on the first of the month in which the annual rent falls due, Lessee, prior to paying the annual rental of $5,000.00, each year during the term hereof, commencing with the fifteenth (15) year, shall refer to the then current United States Consumer Price Index (all items) as compiled by the Bureau of Labor Statistics of the United States Department of Labor (1947 – 1949 = 100). If such index reading at date hereof reflects an increase or decrease in the purchasing power of the United States Dollar equal to five percent (5%) or more, the minimum rent payment hereunder shall be proportionately increased or decreased to the end that rent payments are annually adjusted to maintain the same purchasing power they represented at date hereof, provided that the total increase or decrease above or below the original rental of $5,000.00 per year shall in no event exceed three percent (3%) multiplied by the number of years of said term which shall have expired. In the event the said Consumer Price Index is modified or replaced, the comparable effective cost of living index published by the United States Department of Labor or other Federal agency shall be employed using reasonable and accepted conversion factors as necessary.

In addition to the above mentioned rental, Lessee shall pay ten (10%) per cent of net rentals received after the third year of said term from tenants of any buildings constructed on said property. If Lessee uses or enters into any agreement for the use of said property or any portion thereof for parking or thoroughfare purposes for the benefit of any business conducted in a building or buildings on other property, a portion of any such building or buildings shall be assumed to be on the above described property for the purpose of computing rental hereto. Said portion shall be in the same proportion as the area of the above described property used for such purposes bears to the total area used for building, parking and thoroughfare purposes for the benefit of such business. Net rentals shall be defined as gross rentals from the actual tenants, less payments made for

taxes and assessments, insurance on said premises, management fees not to exceed five (5%) per cent of gross rentals and real estate commissions not to exceed five (5%) per cent of the gross rentals for the first ten (10) years and two–and–a–half (2 1/2%) per cent of the gross rentals thereafter, and depreciation actually taken for income tax purposes.

Commencing with the sixteenth (16) year after completion of the first building constructed on said property, the rental shall be as computed above, or it shall be fifty (50%) per cent of net rentals, whichever is greater.

Lessor shall have the right each year for a period of ten (10) consecutive working days selected by them to audit those books of Lessee pertaining to rentals received by Lessee from such tenants.

Clerk's Papers (July 5, 1988), at 8–9.

Plaintiff–landlord moved for partial summary judgment, asking the court to declare that the same formula for calculating the percentage rent due the landlord applied throughout the term of the lease, that all receipts from subtenants be included in "gross rentals," and that only those expenses listed as deductible in the formula are deductible in calculating rent due. The landlord relied solely on the written lease. The landlord's motion for partial summary judgment was filed before any responsive pleading was filed.

The trial court granted the motion for partial summary judgment, and held that the rental provisions are clear and unambiguous. Defendant then moved to vacate the order granting partial summary judgment or, alternatively, to modify that order to provide that any reimbursements from the subtenants be excluded from the definition of "gross rentals" unless the expenses for which the reimbursements were made can be deducted to determine "net rentals." In support of the motion to vacate or modify, defendant submitted affidavits of intent and the circumstances surrounding the making of the lease.

In the meantime, the landlord filed a final summary judgment motion for a judgment against defendant for past rent due plus interest. The trial court denied defendant's motion and granted the second summary judgment motion. In denying defendant's motion, the trial court (different

from the one which granted partial summary judgment) specifically found that "the affidavits submitted by defendant in support of the motion to vacate are not subject to being considered, and, even if considered, do not alter or modify the clear and unambiguous language of Section 3 of the Lease." Clerk's Papers (July 5, 1988), at 129.

Defendant–tenant appealed, contending that summary judgment was improperly granted. The tenant advanced two theories, either of which would raise factual issues: First, whether the lease is only a partially integrated contract, *i.e.*, whether the writing is a final expression of those terms which it contains, but not a complete expression of all terms agreed upon, *Emrich v. Connell*, 105 Wn.2d 551, 716 P.2d 863 (1986); and second, whether the rental clause is ambiguous. Speaking generally, either situation would allow extrinsic evidence to prove omitted but not inconsistent terms, or to determine the intent of the parties.

The Court of Appeals reversed in part, and attempted to provide a definition of gross rentals by limiting it to payments of the exact same character as the tenant received from his original subtenants under the first subleases. The Court of Appeals added another condition, *i.e.*, that even if the payments by subtenants are not of the same character as payments made by the original subtenants, they constitute gross rentals to the extent the tenant would be required to include them as gross income for tax purposes. The Court of Appeals based its definitions of gross rentals upon what it believed to be the intent of the drafter of the lease.[1]

The Court of Appeals then remanded for resolution of factual questions regarding what expenses were paid by original subtenants and whether the amounts deducted by the tenant are of the same character as payments made by

---

[1]The Court of Appeals erred. First, there was no evidence in the record by affidavit or otherwise of the intent of the drafter of the lease. Second, the intent of the drafter of a document is not relevant unless it expresses the intent of the parties.

the original subtenants for maintenance, repairs, and improvements of the property.

The landlord sought review by this court.

In broad terms, the question posed is the interpretation of the subject lease. Inherent in resolution of that issue are the matters of integration, ambiguity, plain meaning and parol evidence.

Before examining the specific issues raised herein an overview of the problems of interpretation of contracts is necessary. We use the word "interpretation" in the sense described by Corbin and the Restatement and distinguish it from "construction." Corbin states: "Interpretation is the process whereby one person gives a meaning to the symbols of expression used by another person." 3 A. Corbin, *Contracts* § 532, at 2 (1960). The Restatement definition is: "Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning." Restatement (Second) of Contracts § 200 (1981).

Construction of a contract determines its legal effect. "Construction . . . is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation." Patterson, *The Interpretation and Construction of Contracts,* 64 Colum. L. Rev. 833, 835 (1964). *See* 3 A. Corbin, *Contracts* § 534 (1960 & Supp. 1990).

It is deceptively simple to state the purpose of a court in interpreting a contract. "The cardinal rule with which all interpretation begins is that its purpose is to ascertain the intention of the parties." Corbin, *The Interpretation of Words and the Parol Evidence Rule,* 50 Cornell L. Quar. 161, 162 (1965). 4 S. Williston, *Contracts* § 601, at 306 (3d ed. 1961). *See Eurick v. Pemco Ins. Co.,* 108 Wn.2d 338, 340, 738 P.2d 251 (1987); *In re Estates of Wahl,* 99 Wn.2d 828, 830–31, 664 P.2d 1250 (1983); *Dwelley v. Chesterfield,* 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

As would be expected, problems of contract interpretation have long been a source of judicial opinion. *E.g., Smith*

*v. Wilson,* 3 B. & A. 728, 110 Eng. Rep. 266 (K.B. 1832) (where "thousand" was held to mean "1,200"); *Raffles v. Wichelhaus,* 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864). The subject has produced thousands of cases, numerous texts and countless commentaries. A study of these materials, including Washington cases, leads us to concur with the observation: "[T]he rules produced by accumulated decisions as to how such discovery [of the parties' intention] shall be conducted often overlap and sometimes produce hindrance rather than help, while reconciliation of all cases is a task neither possible nor worth the effort . . .". *Nicoll v. Pittsvein Coal Co.,* 269 F. 968, 971 (2d Cir. 1920).

In approaching contract interpretation every court should heed the strong words of Corbin:

> [I]t can hardly be insisted on too often or too vigorously that language at its best is always a defective and uncertain instrument, that words do not define themselves, that terms and sentences in a contract, a deed, or a will do not apply themselves to external objects and performances, that the meaning of such terms and sentences consists of the ideas that they induce in the mind of some individual person who uses or hears or reads them, and that seldom in a litigated case do the words of a contract convey one identical meaning to the two contracting parties or to third persons.

3 A. Corbin, *Contracts* § 536, at 27–28 (1960). Holmes was more poetic: "'A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'" (Footnote omitted.) 4 S. Williston, *Contracts* § 609, at 402 (3d ed. 1961) (quoting *Towne v. Eisner,* 245 U.S. 418, 425, 62 L. Ed. 372, 38 S. Ct. 158 (1918)).

■ A second major point applicable to contract interpretation is that the various principles of interpretation should not be applied as absolutes. They "are to be taken as suggestive working rules only. . . . They will be harmful if they are taken as dogmatic directions that must be followed, or if they mislead us into thinking that language has

only one meaning, the one absolutely correct." (Footnote omitted.) 3 A. Corbin, *Contracts* § 535, at 21 (1960).

Various efforts have been made to compile a set of rules of contract interpretation. *E.g.,* Patterson, *The Interpretation and Construction of Contracts,* 64 Colum. L. Rev. 833, 852 (1964) (listing 10 "standard maxims" of contract interpretation); *see* Restatement (Second) of Contracts § 202 (1981) (listing rules in aid of interpretation). Each set of rules is subject to Corbin's caution. "There is some doubt whether they [maxims of interpretation] have reliable guidance value for judges, or are merely justifications for decisions arrived at on other grounds, which may or may not be revealed in the opinion." Patterson, 64 Colum. L. Rev. at 852; *see Green River Vly. Found., Inc. v. Foster,* 78 Wn.2d 245, 252, 473 P.2d 844 (1970) (Finley, J., concurring); *cf. Eurick v. Pemco Ins. Co., supra* at 340–41 ("rules of construction are not goals in themselves but only aids to interpretation").

With the above observations in mind we turn to the central issue of contract interpretation in this case.

> There remains to be discussed the interpretation issue which presents the greatest difficulty. If the disputed language is written, will the proponent of one meaning be permitted to aid his cause by verbal testimony? If so, what is the permissible range such testimony can take? On these important details the Washington cases are in confusion.
>
> There are cases in which the court examined the circumstances surrounding the execution of a writing as an aid to its interpretation and sustained the admissibility of the pertinent evidence even though the writing might on its face be unambiguous. The position taken in these cases is the one endorsed by Professors Corbin and Williston and by the *Restatement of Contracts.* It is the only approach which can consistently yield interpretations likely to coincide with the meanings the parties contemplated.
>
> There are other cases in which the court indicated that it will not look beyond the four corners of a contract writing unless what appears within those four corners is ambiguous. The reason is variously stated as an interpretation principle, or as an application of the parol evidence rule. Neither reason is persuasive.

(Footnotes omitted.) Shattuck, *Contracts in Washington, 1937–1957: Part II,* 34 Wash. L. Rev. 345, 374–76 (1959). Professor Shattuck cites a number of cases as examples of the contrasting analyses. *See* Shattuck, 34 Wash. L. Rev. at 374 n.403, 376 n.406.

■ Despite the accuracy of the conclusion that seldom will any word or phrase carry only a single meaning which is readily discernible by any reader, this court on occasion has embraced the "plain meaning rule."

> The Plain Meaning Rule states that if a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.

(Footnote omitted.) J. Calamari & J. Perillo, *Contracts* § 3–10, at 166–67 (3d ed. 1987). In following this rule, this court has held that only if a contract is ambiguous on its face will the court look to evidence of the parties' intent as shown by the contract as a whole, its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their interpretations. *E.g., St. Yves v. Mid State Bank,* 111 Wn.2d 374, 378, 757 P.2d 1384 (1988); *Boeing Airplane Co. v. Firemen's Fund Indem. Co.,* 44 Wn.2d 488, 496, 268 P.2d 654, 45 A.L.R.2d 984 (1954); *Bellingham Sec. Syndicate, Inc. v. Bellingham Coal Mines, Inc.,* 13 Wn.2d 370, 384, 125 P.2d 668 (1942).

The plain meaning rule has been criticized by leading commentators. *See, e.g.,* 3 A. Corbin § 542; 9 J. Wigmore, *Evidence* §§ 2461–2462 (1981); 4 S. Williston § 629; 2 E. Farnsworth, *Contracts* § 7.12, at 277–78 (1990); J. Calamari & J. Perillo § 3–10. The rule has been rejected by the Uniform Commercial Code, U.C.C. § 2–202 comment 2, and the Restatement (Second) of Contracts §§ 2002–04 (1981).

As Professor Shattuck notes, however, even while sometimes following the plain meaning rule, this court has not consistently applied it. Instead, the court has also sometimes held that a trial court may, in interpreting contract language, consider the surrounding circumstances leading to execution of the agreement, including the subject matter

of the contract as well as the subsequent conduct of the parties, not for the purpose of contradicting what is in the agreement, but for the purpose of determining the parties' intent. *See, e.g., Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 510 P.2d 221 (1973); *In re Estate of Garrity,* 22 Wn.2d 391, 156 P.2d 217 (1945); *Leavenworth State Bank v. Cashmere Apple Co.,* 118 Wash. 356, 204 P. 5 (1922). As stated in *Stender*:

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

*Stender,* at 254. This analytic framework for interpreting written contract language has been called the "context rule." *Eagle Ins. Co. v. Albright,* 3 Wn. App. 256, 474 P.2d 920 (1970). See *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 442 P.2d 641, 69 Cal. Rptr. 561, 40 A.L.R.3d 1373 (1968) for an excellent articulation of the rationale of the context principle. Other courts have allowed evidence of the circumstances of the making of a contract for the purpose of interpreting the contract. *E.g., Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984); *Admiral Builders Sav. & Loan Ass'n v. South River Landing, Inc.,* 66 Md. App. 124, 502 A.2d 1096 (1986); *Keating v. Stadium Mgt. Corp.,* __ Mass. App. Ct. __, 508 N.E.2d 121 (1987).

The instant case presents a clear opportunity for this court to resolve the long–standing confusion engendered by inconsistent holdings in this area.

■ We now hold that extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent. We adopt the Restatement (Second) of Contracts §§ 212, 214(c) (1981). Section 212 provides:

> (1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light

of the circumstances, in accordance with the rules stated in this Chapter.

(2) A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.

As explained in comment *b* to this section:

It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule stated in Subsection (1) is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.

This court's line of cases which includes *Stender v. Twin City Foods, Inc., supra,* is in line with the Restatement and is in line with ascertaining the parties' actual intent.

Restatement (Second) of Contracts § 214(c) provides that

[a]greements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish

. . . .

(c) the meaning of the writing, whether or not integrated;

Comment *b* to this section explains:

Words, written or oral, cannot apply themselves to the subject matter. The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings of the parties. Even though words seem on their face to have only a single possible meaning, other meanings often appear when the circumstances are disclosed. In cases of misunderstanding, there must be inquiry into the meaning attached to the words by each party and into what each knew or had reason to know.

In discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract.

We note with approval the following general statement of the context rule, which we reaffirm, contained in *J.W. Seavey Hop Corp. v. Pollock,* 20 Wn.2d 337, 348–49, 147 P.2d 310 (1944):

> May we say here that we are mindful of the general rule that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident, or mistake. But, as stated in *Olsen v. Nichols,* 86 Wash. 185, 149 P. 668 [(1915)], parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.

*Pollock,* at 348–49.

We thus reject the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible. Cases to the contrary are overruled.

Another issue involving interpretation which may be relevant in this case concerns the possibility that language used in the lease is technical or constitutes terms of art. If so, the general rule is that such language is to be given its technical meaning when used in a transaction within its technical field. *Keeton v. Department of Social & Health Servs.,* 34 Wn. App. 353, 361, 661 P.2d 982, *review denied,* 99 Wn.2d 1022 (1983); Restatement (Second) of Contracts § 202(3)(b) (1981). Additionally, it is possible that the parties have attached different meanings to certain terms used, and, if so, the rules set out in Restatement (Second) of Contracts § 201 provide guidance.

Finally, before examining the written ground lease, some discussion of defendant's claim that the lease is not a fully integrated instrument is in order. The first point to be made is that the question of integration, and the role of parol evidence in deciding the integration question, is not the same inquiry as the role of parol, or extrinsic, evidence in interpreting a contract. The "parol evidence rule" relates to the former, but not to the latter.

■ Under the parol evidence rule,

> [P]arol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake.

*St. Yves v. Mid State Bank,* 111 Wn.2d 374, 377, 757 P.2d 1384 (1988) (quoting *Emrich v. Connell,* 105 Wn.2d 551, 555–56, 716 P.2d 863 (1986) (quoting *Buyken v. Ertner,* 33 Wn.2d 334, 341, 205 P.2d 628 (1949))).

■ "[T]he parol evidence rule only applies to a writing intended by the parties as an 'integration' of their agreement; *i.e.,* a writing intended as a final expression of the terms of the agreement." *Emrich,* at 556. Where a contract is only partially integrated, *i.e.,* the writing is a final expression of those terms which it contains but not a complete expression of all terms agreed upon, the terms not included in the writing may be proved by extrinsic evidence provided that the additional terms are not inconsistent with the written terms. *Emrich,* at 556.

Defendant–tenant argued to the Court of Appeals that the lease contract was not fully integrated and therefore the parol evidence rule did not apply. This issue arguably was not raised before the trial court, and thus arguably should not be considered by an appellate court. *See* RAP 9.12 (on review of order granting or denying summary judgment motion, "appellate court will consider only evidence and issues called to the attention of the trial court"). Moreover, the tenant did not renew this argument in the answer to the petition for review.

However, we need not reach the question of integration nor do we decide whether the matter is properly subject to appellate review in this case. In light of our adoption of the context rule for interpreting written contracts in accord with the parties' intent, the summary judgment in favor of the landlord must be reversed and this matter must be remanded for trial. As noted, the trial court refused to consider evidence as to the circumstances surrounding the contract under the now disapproved "plain meaning rule." As explained hereafter, there are material questions of fact remaining as to the intent of the contracting parties and interpretation of the ground lease.

Upon remand, the tenant may argue the integration issue. It may be that the lease is an integrated document; if so, it remains to be interpreted. If not, additional terms may be proved insofar as they are not inconsistent with the written terms. While we do not decide the question, we note that it is a reasonable inference from the affidavit of the original tenant's attorney that there were agreements and intentions not expressed in the written lease.

The lease in this case well illustrates why extrinsic evidence is necessary to assist the court in interpreting words and applying them to the actual events in order to ascertain and implement the intentions of the parties.

The lease provides for a possible alternative computation of rent commencing with the 16th year. The record discloses that the original tenant's sublease, the Safeway Stores lease, was for 15 years. The parties had no dispute as to rent calculation during those 15 years. The Safeway lease is relevant because the rental clause calls for a different formula "[c]ommencing with the sixteenth (16) year after completion of the first building constructed on said property". That lease (which constitutes extrinsic evidence) is not in the record and was not considered by the trial court. How do the terms of the original lease bear on the meaning and purpose of the different rent formula in the ground lease which comes into operation at the end of that sublease?

"Gross rentals" is the starting point for determining the division between the landlord and the tenant, but the term "gross rentals" is not defined. What did the parties intend to be the meaning of that phrase? The trial court held the term included "all amounts received from subtenants of the shopping center." Under this interpretation the ground tenant is out of pocket 50 percent of the reimbursement from the subtenants. For example, if the ground tenant pays out $10,000 for common area maintenance and is reimbursed that $10,000 by a subtenant, he is then whole, but under the trial court's holding, he must pay $5,000 *to* the landlord.

In actual operation, according to the record, in 1 year actual common maintenance expenses paid by the ground tenant were $28,952.78. By reimbursement from subtenants the ground tenant is made whole, *i.e.,* he neither loses nor gains. But under the landlord's interpretation, adopted by the trial court, the tenant must (1) include $28,952.78 in gross rents, and (2) cannot deduct those actual expenses to calculate net rentals against which the 50 percent rental formula is applied. Therefore, the tenant must pay $14,476.39 to the landlord.

 Given this result, if the trial court determines the language is subject to two possible constructions, it should apply the following principle:

> When a provision is subject to two possible constructions, one of which would make the contract unreasonable and imprudent and the other of which would make it reasonable and just, we will adopt the latter interpretation. *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 790, 466 P.2d 515 (1970).

*Fisher Properties, Inc. v. Arden–Mayfair, Inc.,* 106 Wn.2d 826, 837, 726 P.2d 8 (1986); *see* Restatement (Second) of Contracts § 203(a) (1981).

In contrast to the trial court's interpretation of the lease, the Court of Appeals held that if such expenses had been paid directly by a subtenant, they were not gross rentals. The Court of Appeals held that so long as reimbursements were of the exact same nature as those paid by the original

subtenants they were not gross rentals. Apparently the Court of Appeals divined the intent of the parties for 99 years from the terms of the first 15–year sublease, but modified that by excluding direct payments by subtenants to the extent that the landlord would have to include such direct payments within his income for federal income tax purposes. We find no support in the record that the treatment of a money item was to be governed by federal income tax law. We note that when income tax law was relevant, it was expressly so provided, *e.g.,* the deduction for depreciation in arriving at "net rental" referred to "depreciation actually taken for income tax purposes." (As an aside, we note that even that specificity could create a problem of interpretation if the tax deduction allowed by Internal Revenue Service were different from that actually taken.)

Adding to the problem of interpretation of the parties' lease, the language "gross rentals from actual tenants" requires reference to rental income from the subtenants. The only sublease in the record provides for the subtenant to pay a proportionate share of specified expenses, including operating expenses and expenses of maintaining common areas of the shopping center. However, the sublease specifically states that such proportionate share is "in addition to the rent." What is the effect of the subleases' characterization of income?

Further questions remain. Under the lease definition of "net rentals," the ground tenant could deduct from the proportionate share paid by subtenants those amounts representing taxes and insurance, but not amounts paid out of pocket for common area maintenance and operation. The amount reimbursed to the ground tenant is significant, *e.g.,* $28,952.78 in the rent year ending in October 1987. The trial court even included within gross rentals interest paid to the ground tenant on funds held by the property manager before rent was due the landlord. These facts seem to require application of the principle noted above that the court should take into account "the reasonableness of

respective interpretations advocated by the parties." *Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 254, 510 P.2d 221 (1973).

Continuing the interpretation confusion is the fact that the lease provides that its term shall be 99 years. Paragraph 3 provides: "The rental shall be Five Thousand and No/100 Dollars ($5,000.00) per year . . . of *each year during the term of this lease.*" (Italics ours.) The lease later describes the $5,000 as "minimum rent payment hereunder" with an adjustment consistent with the Consumer Price Index. Clerk's Papers (July 5, 1988), at 8.

The lease goes on to provide that "[i]n addition to the above mentioned rental," there shall be paid a percentage of net rent after the third year. Clerk's Papers (July 5, 1988), at 9. Thus, from the third year through the 15th year, it is clear that the $5,000 is paid in addition to the specified percentage of net rentals. The problem arises from the language applicable to the 16th year and subsequent years. It provides that the rental shall be "as computed above" (*i.e.,* the adjusted $5,000 *plus* 10 percent of net rentals) or "it shall be fifty (50%) per cent of net rentals, whichever is greater." Clerk's Papers (July 5, 1988), at 9. The obvious question is whether the minimum rent is in addition to the 50 percent or is no longer to be considered. Preceding the 50 percent language the lease provides in two separate paragraphs that the $5,000, as adjusted, shall be paid "each year during the term hereof." The lease defines the "term" as 99 years. If the rent is to be calculated under the phrase "or it shall be fifty (50%) per cent of net rentals," without the additional minimum rent, there is a conflict with the provision that the $5,000, as adjusted, shall be paid *every* year during the 99–year term.

Avoidance of this conflict presents another problem, however. If $5,000 is to be paid every year during the lease term, in addition to a percentage of net rentals, then the language applicable to the 16th year and thereafter seems

to make no sense. That is, $5,000 (as adjusted) plus 10 percent of net rentals would be compared to $5,000 (as adjusted) plus 50 percent of net rentals.

Another significant question of intent and meaning arises from the listing of permissible deductions from gross rentals to arrive at net rentals. This question exists even under the landlord's contention that the only deductions from gross rentals are those defined in the lease. The question comes from the authorization to deduct "real estate commissions not to exceed five (5%) per cent of the gross rentals for the first ten (10) years and two–and–a–half (2½ %) per cent of the gross rentals thereafter." Clerk's Papers (July 5, 1988), at 9. The landlord contends that the limitation for deductible real estate commissions refers to the years of the master lease. That is, during the first 10 years of the 99–year term, the ground tenant can deduct up to 5 percent of the gross rentals for real estate commissions and only 2½ percent for the remaining 89 years. The ground tenant argues that this limitation refers to the length of the terms of the subleases. Thus, if, in the 20th year of the master lease, there was negotiated a 15–year sublease, the ground tenant could deduct up to 5 percent of the gross rent for real estate commissions from that particular lease for 10 years and up to 2½ percent for the remaining 5 years. Again, the differences in the respective contentions are significant. In the lease year ending in October 1986, the ground tenant paid and deducted real estate commissions of $30,141; the landlord's interpretation allowed only $5,067.78.

A major point of dispute is how to arrive at "net rentals" for the 50/50 percent division after the 15th year. Stated again, the lease provides that at that time: "[T]he rental shall be as computed above, *or* it shall be fifty (50%) per cent of net rentals, whichever is greater." (Italics ours.) Clerk's Papers (July 5, 1988), at 9. The phrase "as computed above" can only refer to the preceding paragraph which calls for the minimum $5,000, as adjusted, plus 10 percent of the net rentals. "Net rentals" is defined as "gross

rentals [undefined] from the actual tenants, less payments made for taxes and assessments, insurance on said premises, management fees not to exceed five (5%) per cent of gross rentals and real estate commissions . . . [as above described], and depreciation actually taken for income tax purposes." Clerk's Papers (July 5, 1988), at 9.

The question is whether the phrase "net rentals" to which the 50 percent applies means the same as is defined in the preceding paragraph and particularly whether the deductions from gross rentals are limited to those authorized in arriving at the sum to which the "10 percent of net rentals" is applied. What the parties intended is not clear. When calculating the sum to which the 10 percent applies, after the 15th year, reference is made to the methodology of the preceding paragraph. The 50 percent calculation is preceded by the word "or" and "net rentals" is not referenced to the preceding paragraph as it is in the first part of the sentence. The ground tenant argues that the change from a $5,000 adjusted minimum plus 10 percent of the defined net rentals to 50 percent of undefined net rentals necessarily means that the parties intended a different formula to arrive at a 50/50 percent division of net rentals. He supports his position with the fact that this change in formula coincided with the termination of the known term of the 15–year lease of the first subtenant, that the ground tenant's improvements represent two–thirds of the assessed value of the land and improvements, and that the interpretation and intent he advances is that commonly understood by those operating within the realm of long–term ground leases. This latter point is supported by affidavits from persons with knowledge of such standards.

From accountings in the record, the tenant constructs a model of net incomes to each party under the landlord's theory. In his worst scenario the landlord in 1 year nets $63,280 and the tenant $1,160. In the best year for the tenant, his figures show $80,108 to the landlord and $59,106 to the tenant. The tenant contends that over a 5–year period the average net return is 77 percent to the landlord and 23

percent to the tenant. By setting forth the tenant's contentions on this point we do not mean to imply that they are correct or factually established. What the illustrations do raise is the initial question whether the parties in fact did intend such results. If they did so intend, so be it. However, if it is determined that was not their intent, then the court must determine a more reasonable interpretation from all the circumstances.

From the record it appears that the lease was drafted by the landlord's attorney. Depending on evidence adduced on remand, it may be proper for the court to construe ambiguous language against the drafter's client. *Guy Stickney, Inc. v. Underwood,* 67 Wn.2d 824, 827, 410 P.2d 7 (1966); *Universal/Land Constr. Co. v. Spokane,* 49 Wn. App. 634, 638, 745 P.2d 53 (1987); Restatement (Second) of Contracts § 206 (1981).

Lastly, in anticipation of proceedings after remand, it is necessary to consider the legal effect, if any, of the fact that the landlord accepted the ground tenant's accountings and rent payments for a period of at least 4 years before challenging the deductions from gross rentals. Those deductions were disclosed in the accountings and were greater than allowed by the landlord's interpretation of the lease. The Court of Appeals characterized this as an estoppel argument not raised at trial nor briefed on appeal; therefore, the Court of Appeals refused to consider it. However, estoppel is not the thrust of the tenant's argument. The tenant's accountings and acceptance of payment in accordance therewith have been part of the record from the beginning. They are attached to the plaintiff's complaint. On their face they show deductions not permitted by the landlord's interpretation as asserted in the complaint and subsequently. From the complaint it appears that the landlord accepted these figures for 3 or 4 years without objection.

This acceptance of accountings and payments over a period of years may be considered as an aid to ascertainment of the intent of the parties. It is well established that

subsequent acts and conduct of the parties to the contract are admissible to assist in ascertaining their intent. *Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 254, 510 P.2d 221 (1973); *Carlyle v. Majewski,* 174 Wash. 687, 690, 26 P.2d 79 (1933); Restatement (Second) of Contracts § 202(4) (1981). This point was raised factually in the trial court by the tenant's affidavit. Clerk's Papers (July 5, 1988), at 36. It was raised legally in the tenant's memorandum in opposition to summary judgment, including citations to Washington cases. Clerk's Papers (July 5, 1988), at 105. On appeal, the tenant factually and legally raised the point. Brief of Appellant, at 13, 40, 49–50. Thus, contrary to the statement by the Court of Appeals, the evidence of the landlord's acceptance of the tenant's accountings and payments in accordance therewith was asserted throughout the proceedings and for the legitimate purpose of aiding in determining intent.

As to an estoppel argument, in contrast, the only reference to estoppel is in a footnote in appellant's brief where it is noted: "Aside from proof of the parties' intent, [the landlord's] conduct over five (5) years constituted an estoppel and/or waiver. Here, summary judgment was granted even before affirmative defenses were asserted in an answer." Brief of Appellant, at 50 n.6. This evidence was not considered by the trial court because that court excluded all evidence extrinsic to the lease. Whether affirmative defenses of waiver and estoppel are pleaded on remand awaits proceedings below. Thus, it remains to be seen whether the evidence may be considered.

In conclusion, it is apparent from our analysis of the contract language that there are certain ambiguities appearing on the face of the lease instrument. Lest there be any doubt as to our holding, we expressly state that we are not implicitly applying the "plain meaning rule." Whether or not ambiguity is apparent from the face of a contract, evidence of the circumstances of the making of the contract is admissible. We reject the plain meaning rule and expressly adopt the context rule as the applicable rule for

ascertaining the parties' intent and interpreting written contracts.

The trial court is reversed and the matter remanded for proceedings consistent with this opinion.

CALLOW, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, DURHAM, SMITH, and GUY, JJ., concur.