

2015 APR 13 AM 9: 3ɔ

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PACIFIC MARKET INTERNATIONAL, LLC, )<br>a Washington limited liability company, ) | No. 71707-3-I |
| ) | |
| Respondent, ) | DIVISION ONE |
| ) | |
| v. ) | |
| ) | |
| TCAM CORE PROPERTY FUND ) | UNPUBLISHED OPINION |
| OPERATING LP, a Delaware limited ) | |
| partnership, ) | FILED: April 13, 2015 |
| ) | |
| Appellant. ) | |
| ) | |

BECKER, J. — This is an appeal from an order granting summary judgment in a contract dispute involving the interpretation of a parking agreement. We reverse and hold that the landlord agreed to provide parking on a "must take" rather than an "as needed" basis. The plain language of the agreement obligates the tenant to pay for a certain number of spaces every month whether or not the tenant actually needs them.

The landlord, appellant in this matter, is TCAM Core Property Fund Operating LP (TCAM). The tenant, respondent, is Pacific Market International LLC (PMI). They entered into a 132-month commercial real estate lease, which began on October 1, 2010, and is set to expire on September 30, 2021. TCAM has been billing PMI for the right to the nonexclusive use of 34 parking stalls every month. PMI has been paying under protest, while contending that the

parking payment obligation in the lease agreement is variable, covering only the number of spaces PMI needs to use in any given month.

In February 2012, PMI initiated this declaratory judgment action. On cross motions for summary judgment, the trial court ruled in favor of PMI. PMI was awarded damages, attorney fees, costs, and postjudgment interest. TCAM appeals.

This court reviews orders granting summary judgment de novo. Silverhawk, LLC v. KeyBank Nat'l Ass'n, 165 Wn. App. 258, 264-65, 268 P.3d 958 (2011). The material facts underlying this litigation are essentially undisputed.

WRC Wall Street LLC began constructing the World Trade Center North office building on Elliott Avenue in Seattle in 1997. WRC Wall Street leased the entire building to RealNetworks Inc. from October 2000 through September 2010. That lease required RealNetworks to assume one of the ownership obligations by paying the Port of Seattle for 133 parking spaces the Port owned below the building.

In April 2005, RealNetworks subleased part of the building's fourth floor to PMI. The sublease obligated PMI to pay for parking on an as-needed basis. The operative language was that PMI, the subtenant, "shall have the right, but not an obligation" to lease 1.2 parking stalls for each 1,000 rentable square feet described in the sublease. PMI had to advise RealNetworks 33 days in advance of each calendar month if it wanted to alter the number of spaces rented during the following calendar month.

2

In 2007, TCAM bought the World Trade Center North building from WRC Wall Street and assumed the master lease between WRC Wall Street and RealNetworks. By this purchase, TCAM became subject to WRC Wall Street's obligation to pay the Port of Seattle for 133 parking spaces each month.

Keith Awad, TCAM's asset management director, came to Seattle in the summer of 2009. During that trip, Awad introduced himself to PMI's Chief Executive Officer, Rob Harris, and its Chief Financial Officer, Brian Shea. PMI, acting through Shea, expressed an interest in leasing space from TCAM after its sublease with RealNetworks expired in September 2010. The parties began to negotiate through brokers.

In September 2009, TCAM's brokers presented a draft letter of intent to PMI. The draft proposed a set of material terms that TCAM wanted to govern its future landlord-tenant relationship. It described a number of terms, including one that described the "parking requirement" of 1.2 spaces per 1,000 rentable square feet (RSF):

> Parking: The parking requirement for the building is 1.2:1000 RSF leased at market rates, current $220 per stall per month. The parking structure is controlled by the Port of Seattle, but the allocation will remain for the duration of the lease. The landlord is exploring locating some visitor parking in the loading area and will keep tenant informed of the progress/results. Additionally the landlord is also exploring where Bike Parking could be located.

This language remained unchanged over the next several months as the parties exchanged, modified, and finalized the terms of the letter of intent. TCAM used the final version as a guide when drafting the actual lease.

TCAM contends the reference to the building's parking "requirement" manifested an intent to pass on to PMI a proportionate share of TCAM's obligation to pay the Port of Seattle for 133 spaces. PMI contends the language is too obscure to express such an intent. The parties' differing interpretations of the letter of intent, however, are not particularly relevant. This issue here is the meaning of the actual lease.

The parties exchanged, commented on, and redlined at least eight lease drafts before signing the final version. Each draft was divided into two sections: the Basic Lease Provisions and the Standard Lease Provisions. According to Standard Lease Provision 19(u), the lease "is the result of arms-length negotiations between Landlord and Tenant and their respective attorneys," which "shall not be construed against either party."

Basic Lease Provision item 13 and paragraph 18(a) of the Standard Lease Provisions contain the lease's only references to parking. For this dispute, the most important language in item 13 states that PMI "shall lease" 34 parking spaces.

> **13. Number of Parking Spaces**: Tenant shall lease thirty four (34) parking spaces in the Garage, pursuant to the provisions of Paragraph 18(a) below. All such parking shall be on an unassigned self-park basis at the rate established by the Port of Seattle (its successors or assigns) or its parking operator from time to time (collectively, the "Garage Owner"), which rate is currently $220 per month per stall. Tenant's lease of parking spaces is pursuant to a ratio of 1.2 spaces per 1,000 rentable square feet of

Premises, and thus Tenant's lease of parking spaces hereunder shall increase on a proportionate basis upon addition of each Pocket Space as set forth in Paragraph 21.

At one point during the negotiations, PMI sent a letter asking TCAM to modify item 13 "to conform to Section 18 which correctly describes the agreement between the parties." But TCAM did not agree to any modification of item 13, and PMI eventually signed the lease with the "shall lease" language quoted above.

The "shall lease" obligation in item 13 is "pursuant to" paragraph 18(a) in the Standard Lease Provisions. Paragraph 18(a) discusses the obligations created by item 13 in greater detail. Paragraph 18(a) is presented below in its final form. The underlining and stricken portions track the modifications made during the negotiation process. For the present dispute, the most important language in paragraph 18(a) states that PMI "shall have the right to the nonexclusive use" of 34 parking spaces.

Tenant shall have the right to the nonexclusive use of the number of parking spaces located in the parking areas of the Building specified in *Item 13* of the Basic Lease Provisions for the parking of operational motor vehicles used by Tenant, its officers and employees only. In addition, there will be two (2) visitor parking spaces available to visitors of tenants of the Building on a non-exclusive basis. Parking fees for each month shall be paid to Landlord simultaneously with Rent. Parking fees shall equal the parking fees charged by the Garage Owner. In addition, Tenant shall have the right to one (1) executive parking stall located in the loading area of the Building at a cost of one hundred and fifty percent (150%) of the parking fees charged by the Garage Owner, which; such cost is $330 per stall as of the date of this Lease amounts to a monthly charge of $330 per stall. Landlord. The visitor spaces and the executive parking stall shall also provide a secured area for the storage of bicycles be striped, numbered and

marked with signs that state such spaces shall not be blocked. Tenant acknowledges that because Landlord does not own the parking garage, Landlord cannot guarantee the condition or availability of the same; provided that Landlord agrees to use reasonable efforts to assist Tenant in obtaining the right to use its parking spaces hereunder. Tenant agrees at all times to comply with reasonable rules and regulations established by the Garage Owner and/or Landlord with respect to use of the parking garage, including without limitation hours of availability. A default by Tenant, its officers or employees with respect to such rules and regulations shall constitute a material default by Tenant hereunder. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's officers, employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord or Garage Owner for such activities. If Tenant permits or allows any of the prohibited activities described in this Paragraph, then Landlord or Garage Owner shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.[1]

This court must interpret the lease "in a manner that gives effect to all the contract's provisions." Nishikawa v. U.S. Eagle High, LLC, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007), review denied, 163 Wn.2d 1020 (2008). We may not "disregard language that the parties have used." Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc., 173 Wn.2d 829, 840, 271 P.3d 850 (2012). Applying these principles, we conclude the parking provision is on a "must take" rather than an "as needed" basis. The meaning of "Tenant shall lease thirty four (34) parking spaces" is plain and unambiguous. It creates an obligation to lease 34 spaces. The effect is to pass on to PMI a proportionate share of TCAM's obligation to pay the Port of Seattle for 133 spaces.

---

[1] Compare Clerk's Papers at 282 (TCAM's first proposed lease) with Clerk's Papers at 40 (executed lease).

We reject PMI's argument that paragraph 18(a) gives it the *right* but not the *obligation* to pay for 34 spaces. This was the arrangement that PMI had when it was a subtenant of RealNetworks, but it is not the arrangement reflected in its lease with TCAM. PMI's suggested interpretation would reduce the phrase "shall lease" in item 13 to mere surplusage.

PMI offers the RealNetworks sublease as extrinsic evidence that the intent of the present lease is to create a similar as-needed arrangement. Extrinsic evidence can be used to discern contractual intent, but it cannot be used to subtract, vary, or contradict the written words of a contract. Berg v. Hudesman, 115 Wn.2d 657, 667-78, 801 P.2d 222 (1990). Unlike the PMI sublease, neither item 13 nor paragraph 18(a) specifies how and when PMI would need to advise TCAM of its fluctuating need for parking. PMI's preferred interpretation would require this court to redraft the lease by including such language. This we cannot do. "Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written." Hollis v. Garwall, Inc., 137 Wn.2d 683, 697, 974 P.2d 836 (1999).

PMI contends the "shall lease" obligation in item 13 conflicts with the language in paragraph 18(a) and must therefore give way under a term specifying that the Standard Lease Provisions shall control in the event of a conflict with the Basic Lease Provisions:

> This Lease consists of the foregoing introductory paragraphs and Basic Lease Provisions, the provisions of the Standard Lease Provisions (the "Standard Lease Provisions") (consisting of Paragraph 1 through Paragraph 25 which follow) and *Exhibits A-1* through *Exhibits A-2* and *Exhibits B* through *Exhibit G*, all of which are incorporated herein by this reference. In the event of any

conflict between the provisions of the Basic Lease Provisions and the provisions of the Standard Lease Provisions, the Standard Lease Provisions shall control.

According to PMI, conflict arises from the fact that paragraph 18(a) speaks only in terms of PMI's "right" to parking spaces, not its obligation to pay for them. We disagree. Item 13 in the Basic Lease Provisions creates PMI's obligation to take 34 parking spaces, and paragraph 18(a) in the Standard Lease Provisions adds details to that arrangement. No conflict is apparent. Nowhere in paragraph 18(a) does one find language suggesting that PMI's obligation is limited to the number of parking spaces it may need in any given month.

PMI attempts to escape the "must take" interpretation by invoking the RESTATEMENT (SECOND) OF CONTRACTS § 201. If it is possible that the parties have attached different meanings to certain terms used, the rules set out in RESTATEMENT (SECOND) OF CONTRACTS § 201 provide guidance. Berg, 115 Wn.2d at 669. PMI contends the parties ascribed different meanings to the general parking language that carried through the various iterations of the letters of intent and the lease. In that situation, section 201(2) applies:

> Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
> (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
> (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

RESTATEMENT (SECOND) OF CONTRACT § 201(2).

PMI invokes subsection (b) to argue that the contract must be interpreted in accordance with its understanding, not TCAM's. This is so, according to PMI, because PMI did not know that TCAM believed the contract created a "must take" obligation, but TCAM knew PMI attached an "as needed" meaning to the lease's parking provisions.

The record does not support PMI's argument. At one point during their negotiations, PMI sent TCAM a letter with "comments and proposed changes" regarding the draft lease. One of the many items on this list stated: "The provisions of Section 13 should be modified to conform to Section 18 which correctly describes the agreement between the parties. Tenant should also be entitled to use two visitor stalls in the loading area free of charge." The comment did not specifically refer to the "shall lease" language in item 13, nor did it communicate PMI's desire for an "as needed" arrangement. Therefore, it cannot be deduced that TCAM, upon reading this letter, should have realized PMI interpreted item 13 to create "as needed" arrangement. In addition, PMI's internal communications reflect the company's awareness that item 13, as drafted, "makes it an obligation." Clerk's Papers at 343.

PMI claims that even if TCAM's interpretation prevails, this matter must be remanded for trial because TCAM has failed to mitigate its damages. According to PMI, TCAM failed to make reasonable efforts to avoid damages from PMI's inability to use all 34 parking spaces and even affirmatively ignored expressions of interest from a third party.

9

The doctrine of avoidable consequences, or mitigation of damages, prevents an *injured* party from recovering damages that the party could have avoided through reasonable efforts. TransAlta Centralia Generation LLC v. Sicklesteel Cranes, Inc., 134 Wn. App. 819, 825-26, 142 P.3d 209 (2006), review denied, 161 Wn.2d 1013 (2007). TCAM has not been injured. PMI has been paying under protest for the parking spaces it does not use. Because TCAM has not incurred a duty to mitigate, there is no reason to remand this matter for trial.

In summary, the trial court erred by entering judgment for PMI. The case is remanded with instructions to enter judgment in favor of TCAM and to award TCAM its attorney fees and costs in accordance with the attorney fee provision of the lease. That award shall include TCAM's reasonable attorney fees for this appeal.

Reversed.

Becker, J.

WE CONCUR:

Trickey, J