2015 JUN 15 AM 9: 15


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| BARRIE BEHRMANN and RONALD BEHRMANN, | ) ) ) | No. 71502-0-I |
| Appellants, | ) ) | |
| v. | ) ) | |
| FRANK D'APRILE, | ) ) | UNPUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: June 15, 2015 |

VERELLEN, J. — For a contract to be enforceable, it must be supported by consideration. Because Frank D'Aprile's promissory note in favor of Barrie and Ronald Behrmann lacked consideration, we affirm the dismissal of the Behrmanns' suit against D'Aprile for breach of the note.

## FACTS

Barrie and Ronald Behrmann purchased Seattle Sun, a tanning salon, in 1996.[1] Frank D'Aprile was a customer at the tanning salon several times a week. The Behrmanns and D'Aprile became good friends, attending sporting events and parties together, and the Behrmanns gave D'Aprile a key to the salon and allowed him to use the tanning beds for free.

---

[1] Because Barrie and Ronald Behrmann share the same last name, we refer them by their first names for clarity.

In 2007, after Barrie became ill and unable to work, the Behrmanns decided to sell the tanning salon to D'Aprile. The Behrmanns and D'Aprile executed a purchase and sale agreement and a bill of sale. The purchase and sale agreement, dated February 28, 2007, provided, in relevant part, as follows:

> Based on the foregoing, and in consideration of the mutual agreements, covenants, and conditions contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:
>
> . . . .
>
> 2. Purchase and Sale. The assets shall be purchased as of the closed [sic] of business on February 28, 2007 (the "closing date"), all in accordance with the provisions set forth in this agreement. The Seller shall sell, assign, and transfer all of the assets to the Buyer as of the close of business on the closing date on February 28, 2007 . . . .
>
> 3. Purchase Price. In consideration for the sale of the assets, the Buyer agrees to pay and the Seller agrees to accept a cash payment in the amount of $35,000 (the "Purchase Price").[2]

The agreement provided that "[t]he Seller and the Buyer each hereby represents and warrants to and covenants to each other party that . . . [s]uch party relies on the finality of this Agreement as a material factor inducing the party's execution of this Agreement, and the obligations under this Agreement."[3] The only purchase price referenced in the agreement was $35,000.

The bill of sale, also dated February 28, 2007, provided as follows:

> Know by all these present: That BARRIE BEHRMANN and RON BEHRMANN, d/b/a SEATTLE SUN, sole proprietorship ("seller") for an [sic] in consideration of the sum of THIRTY FIVE THOUSAND DOLLARS ($35,000.00) paid to seller by FRANK D'APRILE (buyer(s)), the receipt and adequacy of which are hereby acknowledged, hereby sells, and delivers unto "buyer(s))" all of the inventory and tangible assets used as a

---

[2] Ex. 4.

[3] Ex. 4.

2

part of or in connection with "sellers" operation including, but not limited to, the furniture, fixtures, equipment and the goodwill related to sellers operation (the "assets") described on schedule "A" attached hereto and incorporated herein by this reference.

To have and to hold all the "assets" unto "buyer(s))", their successors and assigns forever, "seller" hereby represents covenants and warrants to "buyer(s))" that "seller" is the lawful owner of the "assets"; the "assets" are free from all encumbrances and are in good working order; that "seller" hereby agrees to warrant and forever defend title to the "assets" unto "buyer(s))" against the lawful claim and demands of all persons.[4]

Attached to the bill of sale was a page entitled "Schedule A" listing the assets of Seattle Sun, which included seven tanning beds, equipment and supplies, inventory and goodwill. To the right of the column of assets are two handwritten columns of figures, one with a total of $35,000 and one with a total of $80,000. D'Aprile gave the Behrmanns a cashier's check for $35,000 on February 28, 2007.

On March 3, 2007, D'Aprile executed a promissory note payable to the Behrmanns in the amount of $50,000. The note provided, in its entirety, as follows:

PROMISSORY NOTE

$50,000                                    3-3-2007
Principal Amount                           Dated

State of WASHINGTON County of KING

For value received, the undersigned hereby jointly and severally promise to pay to the order of BARRIE BEHRMANN and RON BEHRMANN the sum of FIFTY THOUSAND ($50,000.00) together with interest thereon at the rate of 2% per annum on the unpaid balance. Said sum shall be paid in the following manner.

---

4 Ex. 5.

Amount shall be paid in full on or before MARCH 31, 2012. This note may be prepaid at any time, in whole or in part, without penalty.[5]

D'Aprile signed the note as both borrower and guarantor. The note was witnessed by "Donald K. Hautala."[6]

It is undisputed that D'Aprile made no payments on the note. In 2012, the Behrmanns filed suit against D'Aprile for breach of the note.

At trial, the trial court heard testimony from 5 witnesses and reviewed 16 exhibits. Ronald testified that he met D'Aprile at a restaurant sometime in early 2007 to discuss the terms of the sale. According to Ronald, D'Aprile offered to pay $85,000 for the tanning salon, but did not have cash for the full payment. Ronald claimed D'Aprile offered a cashier's check for $35,000 and a promissory note for the remaining $50,000, which he agreed to pay off in five years. Ronald verbally agreed to the sale and purchase price, but no paperwork was signed at the restaurant meeting.

The Behrmanns' daughter, Lisa Hale, prepared a purchase and sale agreement and a bill of sale based on sample documents she found on the Internet. Hale acknowledged that she was not a lawyer and had no legal training. D'Aprile came to the Behrmanns' home on February 28, 2007, where he gave them the cashier's check for $35,000 and signed the purchase and sale agreement and the bill of sale. Ronald did not remember who wrote the columns of numbers attached to the bill of sale or what they represented. Because Hale had not prepared a promissory note, Ronald testified that he and D'Aprile planned to meet at the tanning salon that Saturday, March 3, so D'Aprile could execute the note.

---

[5] Ex. 7.

[6] Ex. 7.

On March 3, Ronald met D'Aprile at the tanning salon. Ronald brought copies of the documents signed on February 28 and a promissory note with blank spaces for the date, amount, interest, and payee. Ronald testified that a customer, Donald Hautala, walked into the tanning salon just as he and D'Aprile were filling in the note. Ronald testified:

> Initially, we asked if he would sign or witness the signature on the promissory note. And he at that time asked, you know, "What am I signing?" and Frank told him that it was the final payment for the salon, $50,000, plus the $35,000 cashier's check.[7]

Hautala also testified that Ronald and D'Aprile asked him to witness D'Aprile's signature on the promissory note, and that D'Aprile told him the purchase price for the salon was $85,000.

D'Aprile testified that when he met Ronald at the restaurant, Ronald told him the purchase price for the salon was $35,000. D'Aprile testified that Ronald was evasive about the tanning salon's financial condition but told him "You're going to make a lot of f-ing money, Franko."[8] He described the $50,000 promissory note as a profit-sharing arrangement with the Behrmanns:

> Well, besides asking for--he wanted $35,000 for the business, which I agreed upon without any negotiation. I took his word at what it was for. And I had no reason not to believe that I would make money, but he wanted to share in the money that I was making. And if there was profits that were made, I would share in that. And he had written a figure of $50,000 and I had asked him, "How am I going to afford to pay this?" "You're going to make a lot of money. You'll do well." And so I took his word at being honest to me and being true that that's what would happen and so I was willing to share in my profits if there was.[9]

---

[7] Report of Proceedings (RP) (Nov. 19, 2013) at 38.

[8] RP (Nov. 20, 2013) at 112.

[9] RP (Nov. 20, 2013) at 113.

5

D'Aprile also testified that payment on the $50,000 note was "contingent on the shop making profits."[10] He testified that the tanning salon never made a profit under his ownership and that he was unable to pay the note when it came due, telling Ronald, "Look, our deal was profits. There never was any profits."[11] Regarding the columns of numbers in the bill of sale, D'Aprile testified:

Q. There's some numbers here under, "Value." Is that your handwriting?

A. No, this is Ron's.

Q. Do you know why are there two columns of numbers?

A. Well, because we had a sale agreement for $35,000 and so I didn't know how to fill this in and this was what was going to have to go to my CPA and what I was going to have to pay tax on as far as the equipment with the State. And so he wrote these numbers down to equal the 35,000 for the sale.

Q. Why is there a second column of numbers there?

A. Well, we had talked about profits and we had talked about him sharing that. And I says, "Well, then how do I deal with this with my CPA if I'm paying more money than what I actually paid for the salon, because I'm only paying 35. That is the cost and purchase of the salon." And he says, "Well, then you just have to go and, you know, change these numbers a bit to equal more."

Q. Did he write in those figures then, the second column?

A. Yes.[12]

D'Aprile denied telling Hautala that the purchase price was $85,000, and testified that "literally his involvement with it was knowing that it was something to do with the salon

---

[10] RP (Nov. 20, 2013) at 123.

[11] RP (Nov. 20, 2013) at 123.

[12] RP (Nov. 20, 2013) at 115-16.

and the purchase that we had talked about."[13]

Cary Deaton, a certified public accountant who specializes in valuing small businesses for the purposes of litigation, calculated that the value of an ownership interest in the tanning salon was $22,000. He testified that the tanning salon operated at a loss in 2004, 2005, and 2006, the last three years of the Behrmanns' ownership.

Following two days of testimony, the trial court found that the purchase and sale agreement and bill of sale clearly stated the purchase price as $35,000 and that neither referenced any additional amount to be paid by the promissory note. The trial court also found that all of the available evidence showed that the tanning salon's value was $35,000, at most. The trial court concluded that the promissory note was unenforceable for lack of consideration. The trial court dismissed the Behrmanns' claim with prejudice and imposed costs and attorney fees in favor of D'Aprile totaling $519.96. The Behrmanns appeal.

## DECISION

We review the decision following a bench trial to determine whether substantial evidence supports the findings of fact and whether those findings, in turn, support the conclusions of law.[14] Substantial evidence is evidence in sufficient quantity to persuade a fair-minded person of the truth of the finding.[15] We will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence."[16] We defer to

---

[13] RP (Nov. 11, 2013) at 118.

[14] Ridgeview Props. v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982).

[15] Id.

[16] Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010).

the trial court on issues of witness credibility and persuasiveness of the evidence.[17]

Unchallenged findings of fact are verities on appeal.[18]

The Behrmanns challenge the following findings of fact:

> 2. Plaintiffs and Mr. D'Aprile entered into a purchase and sale agreement for the business known as Seattle Sun on February 28, 20[0]7. Plaintiffs' daughter Lisa Hale drafted the purchase and sale agreement and related documents on Plaintiffs' behalf and at Plaintiffs' request. The contract provided for a purchase price of $35,000 and set the closing date for February 28, 2007. The contract did not contain any reference to a promissory note or to a price greater than $35,000.

> 3. On the closing date, Mr. D'Aprile delivered a cashier's check to Mr. Behrmann for $35,000. On the same day, the Behrmanns executed a bill of sale for $35,000, with the attached schedule listing the assets of the business that were sold (tanning beds, equipment, supplies, inventory, and goodwill) and providing the total value of $35,000 for the assets sold.

> . . . .

> 5. In each of tax years 2004, 2005, and 2006, Plaintiffs had gross revenue from the business but reported a loss from the business on their tax returns as follows: $13,622 in 2004, $11,266 in 2005, and $8,544 in 2006.

> 6. The fair market value of the business as of the closing date was equal to or less than $35,000.

> 7. On March 3, 2007, Mr. D'Aprile signed a promissory note in favor of the Behrmanns for $50,000. Plaintiffs' daughter Lisa Hale drafted the promissory note on Plaintiffs' behalf and at Plaintiffs' request. The note did not reference the purchase and sale contract nor did it provide for any payment terms other than a maturity date.

> . . . .

> 9. Ms. Hale and Mr. Hautala did not participate in negotiations for the purchase of the business. The Court found Mr. Hautala's testimony as to what he heard when the promissory note was signed to be less credible than other evidence presented.[19]

---

[17] Boeing Co. v. Heidy, 147 Wn.2d 78, 87, 51 P.3d 793 (2002).

[18] In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

[19] Clerk's Papers at 63-64.

Although the Behrmanns assign error to these factual findings, they do not claim the findings are not supported by the testimony and exhibits, nor do they cite to evidence contradicting the findings.[20] Findings 2, 3, 6, and 7 are uncontroverted by the record. The purchase and sale agreement and the bill of sale clearly indicate that the purchase price was $35,000. Additionally, Deaton calculated the tanning salon's fair market value as $22,000. Although the bill of sale contains two separate calculations of the total value of the tanning salon's assets, $35,000 and $80,000, Ronald did not remember anything about the calculations. D'Aprile testified that the $80,000 figure was an arbitrary amount to be used for tax purposes in the event the tanning salon made a profit. The promissory note does not reference the purchase and sale agreement or the tanning salon in any way. Furthermore, findings 4 and 9 are credibility findings that are not subject to review.

Instead, the Behrmanns appear to primarily be challenging the trial court's conclusion that the promissory note was not enforceable for lack of consideration. A promissory note is a contract to pay money.[21] For a contract to be enforceable, it must be supported by consideration.[22] "Consideration is a bargained-for exchange of

---

[20] See In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (proper challenge to findings of fact requires argument as to "why specific findings of the trial court are not supported by the evidence and to cite to the record to support that argument") (citing RAP 10.3).

[21] Reid v. Cramer, 24 Wn. App. 742, 744, 603 P.2d 851 (1979).

[22] King v. Riveland, 125 Wn.2d 500, 505, 886 P.2d 160 (1994).

promises."[23] "An agreement to do that which one is already obligated to do does not constitute consideration to support a contract."[24]

Here, both the purchase and sale agreement and the bill of sale identified the purchase price as $35,000. On the closing date, D'Aprile gave the Behrmanns a cashier's check for $35,000, and the Behrmanns transferred ownership of the salon to D'Aprile. At that point, each party had fully performed under the contract and had no further obligation to the other. The $50,000 promissory note was not executed until several days after the closing date. Accordingly, it was not supported by consideration because the Behrmanns had already transferred ownership of the tanning salon and therefore, had nothing to offer in exchange.

The Behrmanns contend that the purchase and sale agreement and the bill of sale was not a fully integrated contract. Instead, the Behrmanns claim that the purchase and sale agreement, the bill of sale, and the promissory note were a single transaction. However, the purchase and sale agreement contains an integration clause stating that the parties relied "on the finality of this Agreement as a material factor inducing the party's execution of this Agreement, and the obligations under this Agreement."[25] The presence of an integration clause "strongly supports a conclusion that the parties' agreement was fully integrated."[26] Even if we were to assume the purchase and sale agreement was only partially integrated, i.e., "a final expression of

---

[23] Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 833, 100 P.3d 791 (2004).

[24] Crown Plaza Corp. v. Synapse Software Sys. Inc., 87 Wn. App. 495, 501, 962 P.2d 824 (1997).

[25] Ex. 4.

[26] Olsen Media v. Energy Sciences, Inc., 32 Wn. App. 579, 584, 648 P.2d 493 (1982).

those terms which it contains but not a complete expression of all terms agreed upon"—the terms not included in the writing may be proved by extrinsic evidence only to the extent they are not inconsistent with the written terms.[27]  The Behrmanns' claim that the purchase price was $85,000 is inconsistent with the terms of the purchase and sale agreement.

We affirm the trial court's dismissal of Behrmann's suit.

Both parties request attorney fees on appeal.  The Behrmanns are not entitled to fees on appeal because they are not the prevailing party.  We also decline D'Aprile's request for attorney fees because the Behrmanns' appeal was not frivolous.

_____

WE CONCUR:

Trickey, J.                                    Spearman, C.J.

---

[27] Berg v. Hudesman, 115 Wn.2d 657, 670, 801 P.2d 222 (1990).