142 F.3d 444
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 QUEEN FISHERIES, INC., an Alaska corporation, Plaintiff-Appellee,
v.
TRANS-COASTAL FISHERIES PARTNERSHIP, an Oregon general
partnership; Bering Seafoods, Inc., an Oregon corporation;
Oceans Edge, Inc., an Alaska corporation; Rick H. Berger
and Debbie Berger, husband and wife; Kenneth Ostebo and
Karin Ostebo, husband and wife; and F/V Grand Dutchess,
ex-Brielyn Marie, Official Number 625876, and her engines,
appurtenances, gear, tackle, furniture, equipment, etc.,
Defendants-Appellants.
 
 No. 96-35701.
D.C. No. CV-96-00036-CRD.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 4, 1998.
Decided April 27, 1998.
 Appeal from the United States District Court for the Western District of Washington, Carolyn R. Dimmick, District Judge, Presiding.
 Before ALARCON and HAWKINS, Circuit Judges, and BREWSTER,** District Judge.
 MEMORANDUM*
 Trans-Coastal Fisheries Partnership and its co-defendants (collectively, "Trans-Coastal") appeal the grant of summary judgment for plaintiff Queen Fisheries, Inc. ("QFI"). The district court held that Trans-Coastal breached its contract with QFI by failing to repay loans made by QFI to support Trans-Coastal's crab-fishing operations. On appeal, Trans-Coastal argues that factual issues precluded summary judgment. We review a grant of summary judgment de novo. See Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir.1997). We reverse because we conclude that there was a genuine issue of fact as to whether QFI breached the contract before Trans-Coastal failed to make payments.
 * A. Facts
 In August 1994, QFI made a secured loan to Trans-Coastal to equip and maintain a fishing boat for crab harvesting. The parties also made a "Fishing Agreement" that required Trans-Coastal to sell its catches to QFI, and QFI to buy them unless "market conditions then prevailing ma[d]e it economically impractical for QFI to purchase" catches. The parties agree that the loan and fishing agreements form a single contract. Under the contract, QFI loaned Trans-Coastal the undisputed amount of $189,827.84 and a disputed amount of $58,753.19. The loan was to be repaid in annual installments over three years, beginning on August 1, 1995. As part of the repayment plan, QFI withheld 10% of the purchase price for each catch it bought from Trans-Coastal, which it applied to the loan balance.
 In May 1995, QFI informed Trans-Coastal that it was closing its Dutch Harbor, Alaska, processing plant. Due to the plant closing, QFI could no longer buy Trans-Coastal's catches. The next catch that QFI would have been expected to buy was hair crab, for which the season did not begin until November. According to Trans-Coastal, it had oral discussions in which QFI agreed to extend the approaching loan payment due date. Trans-Coastal did not make the August 1995 loan payment. In January 1996, QFI invoked the acceleration clause of the loan agreement, making all amounts due, and brought this suit to recover on the loan.
 B. District Court Proceedings
 Two weeks after defendants answered, QFI filed a motion for partial summary judgment. At that time, QFI characterized the loan and fishing agreements as separate contracts. There was no evidence that QFI had performed its obligation under the fishing agreement or that its performance was excused. Trans-Coastal timely responded that the two agreements comprised a single contract, that QFI had breached the contract first by closing its Dutch Harbor plant, and that a triable issue of fact existed regarding the extent to which QFI's breach excused Trans-Coastal's repayment obligations. In reply, QFI argued that its obligation to buy Trans-Coastal's catches was excused by the "market conditions" clause of the fishing agreement. In support of this argument, QFI offered the affidavit of John Lecture showing the condition of the crab market. Trans-Coastal subsequently submitted declarations by Carl Cook, a QFI purchasing manager, and Defendant Rick Berger, to rebut QFI's "market conditions" argument. These declarations asserted that the Dutch Harbor plant closed because of mismanagement by QFI rather than outside economic factors.
 Trans-Coastal requested a continuance under Fed.R.Civ.P. 56(f) in order to conduct more discovery. It also moved to amend its answer to add a counterclaim against QFI seeking damages of $650,000 for breach of contract. The district court denied Trans-Coastal's motion to amend but never ruled on the request for continuance.
 The district court granted summary judgment for QFI, finding that QFI could as a matter of law invoke the "market conditions" clause to excuse its nonperformance under the fishing agreement. The district court entered judgment for QFI on both the undisputed and disputed claims. Trans-Coastal moved for reconsideration. The district court denied this motion, finding that mismanagement by QFI was included in the definition of "market conditions" under the contract and that therefore QFI could assert the "market conditions" clause regardless of its alleged mismanagement.
 II.
 Trans-Coastal challenges the district court's decision on the grounds that genuine issues of material fact existed as to: (1) the amount of the loans; (2) QFI's performance under the contract; (3) the meaning of contract language; and (4) modification of the contract. These subjects are considered in turn. We note that although this action sounds in admiralty, we must apply Washington state law due to the choice-of-law provision contained in the contract.
 A. Amount of the Loans
 Trans-Coastal does not dispute that if it is liable, it owes $189,827.84. However, it disputes that QFI advanced it an additional $58,753.19 under the loan agreement. To rebut QFI's claim for $58,753.19, Trans-Coastal offered the declaration of co-defendant Rick Berger, which states that the disputed amount "is not consistent with our records." QFI contends that this court should ignore the Berger declaration because it was neither timely filed nor relied upon by the district court. We find that in any event, the Berger declaration is conclusory and therefore did not raise an issue of fact as to the amount of liability. However, because we reverse the grant of summary judgment, we vacate the amount of the judgment so that it may be reduced by a set-off on remand, if appropriate.
 B. QFI's Performance Under the Contract
 The parties do not dispute that QFI can recover the full amount of the loans if "market conditions" made it economically impractical to keep the Dutch Harbor plant open. Thus, whether QFI can invoke the "market conditions" clause is a question of material fact that would preclude summary judgment if a genuine issue existed. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").
 QFI initially claimed that it was entitled to invoke the "market conditions" clause of its contract with Trans-Coastal due to external economic forces. To support this assertion, QFI offered the declaration of its operations manager, John Lecture. The declaration states that QFI decided to close the Dutch Harbor plant because of declining profit margins in the opilio crab market. The declaration claims that the supply of opilio crab decreased at the same lime that the Japanese market experienced a glut of cheap, superior-quality Russian king crab. It notes that the sale price for opilio crab dropped. significantly in 1996. The declaration concludes that "QFI closed the Dutch Harbor plant just in time to avoid downward spiraling crab markets" that have led to "substantial negative margins in the industry."
 To dispute this evidence, Trans-Coastal submitted the declaration of Carl Cook to show that mismanagement rather than external causes prompted QFI to close its Dutch Harbor plant. We reject QFI's contention that this declaration should be disregarded. The district court considered it in making its decision. Furthermore, it was not untimely as to the issue of "market conditions," because QFI should have raised this issue in its initial papers moving for summary judgment, but it did not, instead filing the Lecture declaration with its reply brief. See Willener v. Sweeting, 107 Wash.2d 388, 730 P.2d 45, 49 (Wash.1986). Trans-Coastal therefore deserved an opportunity to respond to the Lecture declaration after QFI offered it on reply.
 We believe that the Cook declaration created an issue of fact as to the cause of the closure of the Dutch Harbor plant. The Cook declaration states in relevant part:
 5. In my opinion, once Mr. Lecture became General Manager [of the Dutch Harbor plant, which happened sometime after 1992], our business began to deteriorate. Mr. Lecture alienated vessel owners who had been delivering to Queen Fisheries, Inc. for many years, as well as long term vendors and employees. As a result, we eventually lost key fishermen, management and field personnel. We had a difficult time lining up vessels for the 1995 opilio [crab] season.
 6. In my opinion, Queen Fisheries, Inc. deteriorated because of mismanagement....
 Cook was a purchasing and insurance manager with QFI for eight years. QFI claims that Cook does not dispute any fact in the Lecture declaration regarding market conditions, that Cook merely offers a "lay opinion" regarding QFI's "deteriorat[ion]," and that Cook provides no explanation for the financial difficulties suffered by other fish processors soon after QFI closed Dutch Harbor.
 As a purchasing manager, Cook had ample opportunity to make the observations recounted in paragraph 5 of his declaration, and he could be considered an expert for the purposes of those opinion statements. It is not necessary to determine whether he is an expert for the purpose of the opinion given in paragraph 6 of his declaration. Paragraph 5 introduced the possibility that the plant was mismanaged, which reasonably implies that mismanagement caused or contributed to its closure. Trans-Coastal was not obligated to dispute the facts asserted in the Lecture declaration to create an issue of fact as to the cause of the Dutch Harbor plant closure. It was sufficient that Trans-Coastal introduced support for the proposition that mismanagement was a possible factor. The actual cause of the plant closure is therefore a genuine issue of fact.
 C. Meaning of Contract Language
 Because the Cook declaration raises a genuine issue regarding whether mismanagement of the Dutch Harbor plant played a role in its closure, we must determine whether the district court erred in holding that mismanagement is itself a "market condition" that could have excused QFI's performance.[1]
 Trans-Coastal argues that the district court improperly defined the term "market conditions" in the fishing agreement as a matter of law. We agree. We do not think that the term "market conditions" is generally used to describe internal mismanagement. Regardless, under Washington law, contracts are interpreted in light of the circumstances under which the contract was made, and extrinsic evidence is admissible for determining the parties' intent. See Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222, 228 (Wash.1990). The meaning of a contractual term "is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." Id. In this case, the declaration of Rick Berger, a party to the contract, states, "I understood the market conditions clause to address the possibility of an unexpected radical decline in market price."[2] We find that this raises a genuine issue regarding the meaning of the term "market conditions." Because there is also a genuine issue as to whether mismanagement caused the plant closure, summary judgment was inappropriate.
 D. Modification
 Finally, Trans-Coastal contends that a genuine issue remains regarding whether the parties modified the loan agreement to extend the August 1, 1995 payment due date. The district court never considered this issue during summary judgment. Because we reverse the judgment of the district court on other grounds, we need not decide whether there was a valid modification to the loan agreement. The issue may be decided upon remand.
 III
 The district court denied Trans-Coastal's request to file an amended answer that stated counterclaims against QFI. The court essentially ruled that the amendment would be futile because QFI had not breached the parties' contract. Trans-Coastal now argues that, if summary judgment is reversed, it should be allowed to amend its answer. However, QFI points out that the district court has never ruled on Trans-Coastal's many reasons for being allowed to amend. These issues should be left for initial consideration by the district court on remand. See Golden Gate Hotel Ass'n v. San Francisco, 18 F.3d 1482, 1487 (9th Cir.1994).
 REVERSED AND REMANDED
 
 
 
 **
 Honorable Rudi M. Brewster, United States District Judge for the Southern District of California, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Specifically, the district court stated: "All that the Cook declaration establishes is that poor management caused QFI to deteriorate. Presumably this deterioration led to either declining profits or increasing losses, which is the essence of unfavorable market conditions."
 
 
 [2]
 We deem the Berger declaration to be timely on this issue, because the definition of "market conditions" only arose with the district court's decision on reconsideration