IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| BELLEVUE SQUARE, LLC, a Washington limited liability company, | ) ) ) | No. 77770-0-I |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| WHOLE FOODS MARKET PACIFIC NORTHWEST, INC., a Delaware corporation; WHOLE FOODS MARKET, INC., a Texas corporation; | ) ) ) ) ) | |
| Appellants | ) ) | FILED: December 17, 2018 |

SCHINDLER, J. — On July 23, 2015, Bellevue Square LLC executed a 20-year lease with Whole Foods Market Inc. to operate a "365 by Whole Foods" store. Whole Foods closed the store and vacated the premises on October 14, 2017. Bellevue Square filed a lawsuit against Whole Foods  Based on a lease provision containing an "operating covenant," Bellevue Square sought a mandatory preliminary injunction requiring Whole Foods to reopen and continue operating the store. The trial court granted the motion for a preliminary injunction and ordered Whole Foods to reopen the store within 14 days. We granted discretionary review and stayed the preliminary injunction. Because Bellevue Square has only a limited legal right to specific performance under the terms of the lease that is unrelated to the operating covenant

and the lease gives Bellevue Square a plain, complete, speedy, and adequate remedy at law, we reverse and remand.

## FACTS

Bellevue Square LLC is a shopping mall developed and managed by Kemper Development Company with 1.3 million square feet of retail space. In 2013, there were three anchor tenants: Nordstrom occupied 266,708 square feet, Macy's occupied 218,371 square feet, and JCPenney occupied three floors or approximately 200,000 square feet.

In late 2013, JCPenney notified Bellevue Square it planned to vacate the following year. A vice president of leasing contacted Whole Foods Market Inc. about leasing a portion of the space. Whole Foods expressed interest in leasing the ground floor space, approximately 34,000 square feet. Whole Foods decided to open a "365" concept store at the mall. The 365 concept offers lower-price Whole Foods products and operates with fewer employees. The Whole Foods 365 store at Bellevue Square would be the only 365 store located in a mall.

Bellevue Square and Whole Foods[1] executed a lease on July 23, 2015. The lease term is 20 years with four 5-year optional extensions. The lease provides for annual base rent with regular increases according to a set schedule and if gross sales exceed a set amount, the lease requires Whole Foods to pay percentage rent at a rate of two percent of gross sales during each calendar year. The lease contains an "operating covenant" that requires Whole Foods "to conduct and carry on" its business "without interruption" for the first 10 years of the lease and sets minimum business

---

[1] Whole Foods Market Pacific Northwest Inc executed the lease as the tenant Whole Foods Market Inc guaranteed the obligations of the tenant

hours. The lease defines a default and the remedies available to the tenant and the landlord in case of breach.

Whole Foods opened its 365 store in the Bellevue Square space on September 14, 2016. On October 14, 2017, Whole Foods closed the 365 store, sold its inventory, and offered the 56 employees jobs at other stores.

On October 24, Bellevue Square filed a lawsuit against Whole Foods alleging breach of the lease and the guarantee for the lease obligations. Bellevue Square alleged Whole Foods breached the operating covenant of the lease and sought injunctive relief and damages.

On November 15, 2017, Bellevue Square filed a motion for a preliminary injunction to compel Whole Foods to "promptly reopen" at Bellevue Square. Bellevue Square argued it had a clear legal and equitable right under the operating covenant of the lease, section 7.2(b), to require Whole Foods to continue operations and the store closure violated the terms of the lease, resulting in actual and substantial injury. Retail shopping center expert John Talbott and finance economics expert Jarrad Harford submitted declarations in support of the injunction.

Talbott stated that by vacating the premises, Whole Foods disrupted the stability of the shopping center, affected negotiations with potential and current tenants, reduced customer traffic, prevented Bellevue Square from recovering percentage rent, and impacted Bellevue Square's reputation. Harford cites the harms Talbott described and concludes on a more probable than not basis that few of the harms could be quantified with any degree of certainty.

Whole Foods conceded it vacated the premises but asserted that under the terms of the lease, the available remedy for the breach was damages. Whole Foods argued the lease did not give Bellevue Square the clear legal right to specific performance of the operating covenant in section 7 2(b). Whole Foods pointed to section 10.1(a) of the lease that allows Bellevue Square to pursue the remedies available under the lease if Whole Foods vacates the premises, section 10.1(c)(i) that imposes a duty to mitigate damages and requires Bellevue Square to attempt to find another tenant in the event of a default, and section 10.1(c)(iv) that precludes Bellevue Square from recovering consequential damages resulting from Whole Foods' default. Whole Foods argued that interpreting the lease to permit Bellevue Square to compel it to continue operating the store as a remedy for a breach is inconsistent with those provisions of the lease.

The court granted Bellevue Square's motion for a preliminary injunction and ordered Whole Foods to reopen for business at Bellevue Square effective 14 days from the date of the order. The findings state the lease contains an "express 'Operating Covenant' " and "imposes a duty on Whole Foods to be open and operational for at least the first 10 years of the 20-year Lease term." The court rejected the argument that the duty of Bellevue Square to mitigate damages and the inability to recover consequential damages were inconsistent with the relief sought. The court concluded that "Bellevue Square is entitled to specific performance of the Lease."

Whole Foods filed a notice for discretionary review. We granted discretionary review and stayed the preliminary injunction.

4

ANALYSIS

We review a trial court's decision to grant a preliminary injunction and the terms of the injunction for an abuse of discretion. Resident Action Council v. Seattle Hous. Auth., 177 Wn.2d 417, 428, 327 P.3d 600 (2013); Rabon v. City of Seattle, 135 Wn 2d 278, 284, 957 P.2d 621 (1998). "A trial court necessarily abuses its discretion if the decision is based upon untenable grounds, or the decision is manifestly unreasonable or arbitrary." Kucera v. Dep't of Transp., 140 Wn.2d 200, 209, 995 P.2d 63 (2000).

A party seeking a preliminary injunction must show " '(1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him.' " Tyler Pipe Indus , Inc v Dep't of Revenue, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982) (quoting Port of Seattle v. Int'l Longshoremen's & Warehousemen's Union, 52 Wn 2d 317, 319, 324 P.2d 1099 (1958)). If the party fails to show any one of these elements, the court must deny the injunction. Kucera, 140 Wn.2d at 209-10.

In determining whether the party has a clear legal and equitable right, the court examines the likelihood the party will prevail on the merits. Kucera, 140 Wn.2d at 216. "A doubtful case will not warrant an injunction." Huff v. Wyman, 184 Wn.2d 643, 652, 361 P.3d 727 (2015). In deciding whether to grant a preliminary injunction, the court "must reach the merits of purely legal issues." Rabon, 135 Wn.2d at 286. The appellate court on review "must similarly evaluate purely legal issues in assessing the propriety of a decision to grant or deny a preliminary injunction." Rabon, 135 Wn.2d at 286.

"An injunction is distinctly an equitable remedy and is 'frequently termed the strong arm of equity, or a transcendent or extraordinary remedy, and is a remedy which should not be lightly indulged in, but should be used sparingly and only in a clear and plain case.' " Kucera, 140 Wn 2d at 209[2] (quoting 42 Am. Jur. 2d Injunctions § 2, at 728 (1969)). "An injunction is an extraordinary equitable remedy designed to prevent serious harm. Its purpose is not to protect a plaintiff from mere inconveniences or speculative and insubstantial injury." Tyler Pipe, 96 Wn.2d at 796.

Injunctive relief is not warranted "where there is a plain, complete, speedy and adequate remedy at law." Tyler Pipe, 96 Wn.2d at 791. Courts have found remedies to be inadequate where "(1) the injury complained of by its nature cannot be compensated by money damages, (2) the damages cannot be ascertained with any degree of certainty, and (3) the remedy at law would not be efficient because the injury is of a continuing nature." Kucera, 140 Wn.2d at 210.

Whether Bellevue Square has a clear legal and equitable right to specific performance is governed by the language of the lease. The interpretation of a lease is a question of law that this court reviews de novo. 4105 1st Ave S Invs., LLC v. Green Depot WA Pac Coast, LLC, 179 Wn. App. 777, 784, 321 P.3d 254 (2014). The primary goal is to ascertain the parties' intent. Berg v. Hudesman, 115 Wn.2d 657, 663, 801 P 2d 222 (1990). The court determines intent by focusing on the objective manifestation of the parties in the written contract. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Accordingly, a court considers only what the parties wrote, giving words in a contract their ordinary, usual, and popular

---

[2] Internal quotation marks omitted

meaning unless the agreement as a whole clearly demonstrates a contrary intent."

Green Depot, 179 Wn. App. at 784; Hearst, 154 Wn.2d at 503-04.

A contract "should be construed as a whole and, if reasonably possible, in a way that effectuates all of its provisions " Colo. Structures, Inc v. Ins Co of the W., 161 Wn.2d 577, 588, 167 P.3d 1125 (2007).[3] "Interpretations giving lawful effect to all the provisions in a contract are favored over those that render some of the language meaningless or ineffective." Grey v. Leach, 158 Wn App. 837, 850, 244 P.3d 970 (2010). We will not disregard the language the parties chose to use. Snohomish County Pub. Transp. Benefit Area Corp v. FirstGroup Am., Inc., 173 Wn.2d 829, 840, 271 P.3d 850 (2012).

The plain and unambiguous language of the lease does not support the trial court's interpretation.

Section 7.2(b) of the lease requires Whole Foods to conduct its business "without interruption":

> (b)    Operating Covenant. Tenant covenants to conduct and carry on Tenant's business in the Demised Premises without interruption (excluding any temporary period during which Tenant is closed for rebuilding or repairs following a casualty or condemnation or by reason of any Force Majeure Events) for the first ten (10) Lease Years of the Demised Term ("Tenant's Operating Covenant") and, for so long as Tenant's Operating Covenant is in effect, shall keep the Demised Premises open for business at a minimum during the days and hours designated from time to time by Landlord, which at the time of the execution of this Lease Landlord designates to be as follows:

> Monday through Saturday          8:00 a.m. to 9:30 p.m.

> Sunday          9:00 a m. to 7:00 p.m.

> The hours designed by Landlord are minimum hours.  Tenant may remain open for additional hours in its sole discretion.  In no event shall Tenant be

---

[3] Footnote omitted

7

required to be open for business between the hours of 11:00 p.m. and 7:00 a.m. This provision shall not apply if the Demised Premises are closed and the business of Tenant is temporarily discontinued therein on account of strikes, lockouts, casualty or similar causes beyond the reasonable control of Tenant. Tenant shall not be required to be open on Easter, Thanksgiving Day or Christmas Day. Tenant shall keep in stock on the Demised Premises a full and ample line of merchandise for the purpose of operating its business and shall maintain an adequate sales force.

Section 7.2 contains two specific remedies for breach. First, Bellevue Square

may recover liquidated damages if Whole Foods "fail[s] to be open to the public on a

fully-operational basis during the hours required under this Lease":

(c)    Liquidated Damages for Unauthorized Closure. If, after Tenant has initially opened for business at the Demised Premises, Tenant should fail to be open to the public on a fully-operational basis during the hours required under this Lease, and such failure continues for a period in excess of five (5) days after Landlord has notified Tenant in writing of such failure, Tenant shall pay to Landlord, for each hour or portion thereof that Tenant fails to open, One Hundred Dollars ($100.00), within one (1) month of Landlord's written request therefor; but in no event shall the charge described in this Section 7.2(c) exceed Five Thousand and no/100 Dollars ($5,000.00) in any twelve (12) month period during the Demised Term. As long as Tenant opens the Demised Premises for business within one (1) hour of the opening time otherwise required, Landlord agrees to waive two (2) charges described in this Section 7.2(c) during any twelve (12) month period during the Demised Term.

Second, at any time after the Tenant's Operating Covenant "has expired,"

Bellevue Square has the right to terminate the lease if Whole Foods "discontinues

operation of its business" in the premises for six consecutive months·

(d)    Landlord Recapture Right. Notwithstanding the foregoing, if at any time after Tenant's Operating Covenant has expired, Tenant discontinues operation of its business in the Demised Premises for a period of six (6) consecutive months (excluding any temporary period during which Tenant is closed for rehabilitation, modernization or improvement of the Demised Premises, for rebuilding or repairs following a casualty or condemnation or by reason of any Force Majeure Events), Landlord thereafter shall have the right, at its sole option, to terminate this Lease upon advance written notice to Tenant ("Landlord's Termination

8

Notice") given at any time prior to the date Tenant either (A) notifies Landlord in writing that it covenants to re-commence operation of its business in the Demised Premises within two (2) months, or (B) notifies Landlord in writing that it has entered into a binding lease assignment or sublease with an assignee or subtenant in accordance with this Lease who has covenanted to open for business in the Demised Premises within two (2) months. This Lease shall terminate one (1) month after Landlord gives Tenant Landlord's Termination Notice.

Neither remedy applies here. The liquidated damages provision of section 7.2(c) expressly applies to only an "Unauthorized Closure" of the business "during the hours required under this Lease." It permits Bellevue Square to sanction Whole Foods for the failure to open to the public during the hours provided in section 7.2(b). It does not apply in the event that Whole Foods vacates or abandons the property.

Section 7.2(c) further provides:

Notwithstanding anything herein to the contrary, Tenant's late opening or early closure shall not constitute a default under this Lease unless (i) Landlord provides written notice to Tenant of Tenant's late opening or early closure; and (ii) Tenant thereafter opens late or closes early three (3) times in a twelve (12) month period.

By its express terms, the conduct addressed in section 7.2(c) constitutes a lease default in only very limited circumstances. The tenant must open late or close early, the landlord must give the tenant written notice of this, and the tenant must thereafter open late or close early three times in a 12-month period. It is undisputed these events did not occur. Therefore, section 7.2 does not provide a basis for seeking a default remedy against Whole Foods.

The right to recapture provision in section 7.2(d) expressly applies only "after Tenant's Operating Covenant has expired." The Tenant's Operating Covenant is in effect for the first 10 years of the lease agreement. Whole Foods vacated the premises

9

and stopped operating its business after only 1 year, so the right of recapture set out in section 7.2(d) does not apply.

Article 10, "Default and Remedies," governs the landlord's remedies in the event of default by the tenant. Article 10.1(a)(i) specifically identifies "abandonment of the Demised Premises by Tenant." Whole Foods admits default of the lease because it vacated the premises.

Section 10.1(a) states that if Whole Foods defaults in paying rent or performing any of the other agreements in the lease and fails to cure the default, Bellevue Square may treat the default as a breach and pursue its remedies under the lease. The lease states Bellevue Square's remedies are "subject only to the limitations thereon set forth in Section 10.1(c) below." Section 10.1(a) names three specific events that constitute default and breach by Whole Foods:

> (i)     The abandonment of the Demised Premises by Tenant.
>
> (ii)    The failure of Tenant to perform any covenant to pay money as and when due.
>
> (iii)   Tenant's failure to observe or perform any of the other covenants, conditions or provisions of this Lease to be observed or performed by Tenant.

Upon tenant default, section 10.1(b) allows Bellevue Square to either terminate the lease under section 10.1(b)(i) or continue the lease under section 10.1(b)(ii). If Bellevue Square terminates the lease, Whole Foods must "immediately surrender possession" of the premises and pay all past due rent; the "expenses of reletting" the property, including repairs; and "reasonable" attorney fees.

10

At oral argument, Bellevue Square stated it was proceeding under section 10.1(b)(ii). Under section 10.1(b)(ii), "Continue the Lease," Bellevue Square may:

> Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant has vacated or abandoned the Demised Premises. In such event <u>Landlord shall be entitled to enforce all Landlord's rights and remedies under this Lease, including the right to recover the Rent, damages from Tenant's default or breach, and any other payments as they may become due hereunder, and to specifically enforce Tenant's obligations hereunder and obtain injunctive relief from further defaults and breaches</u>, and shall be entitled to enter the Demised Premises for the purpose of curing Tenant's failure to observe or perform any of the other covenants, conditions or provisions of this Lease to be observed or performed by Tenant, and in such case, Tenant shall pay the entire cost thereof as Additional Rent within one (1) month after receipt of an invoice therefor from Landlord.[4]

Under this provision, Bellevue Square can continue the lease and collect rent, damages, and any other applicable payments, "whether or not Tenant has vacated or abandoned" the premises. But section 10.1(c) limits Bellevue Square's remedies as follows:

> (c) <u>Limitations on Landlord's Remedies</u>. Anything in Sections 10.1(a) and 10 1(b) above to the contrary notwithstanding, Landlord's exercise of its rights and remedies at law or in equity upon the occurrence of an Event of Default shall be subject to the following limitations:
>
> (i) <u>Duty to Mitigate</u>. Landlord shall exercise commercially reasonable efforts to mitigate its damages resulting from Tenant's default; provided, however, so long as Landlord has exercised commercially reasonable efforts to mitigate its damages, Landlord shall not be liable to Tenant for, nor shall Tenant's liability to Landlord be diminished by, Landlord's inability to relet the Demised Premises.
>
> (ii) <u>Redecorating Costs</u>. Tenant shall have no liability to Landlord for any costs or expenses incurred by Landlord in connection with redecorating or remodeling the Demised Premises in connection with a reletting thereof.

---

[4] Emphasis added

(iii)    <u>Percentage Rent</u>  Tenant shall have no liability to Landlord for any Percentage Rent that would have accrued subsequent to the later to occur of (A) the last day that Tenant's Operating Covenant is in effect, and (B) the date that Tenant ceases operating its business at the Demised Premises.

(iv)    <u>No Consequential Damages</u>. Except with respect to the specific circumstances described in Section 3.4 above, in no event shall Tenant be liable to Landlord for any indirect or consequential damages including but not limited to, lost rent, revenue, or other payments from other tenants, loss in value of the Development, and/or lost profits.

The trial court concluded these limitations did not prevent ordering Whole Foods to reopen within 14 days. The court concluded the duty to mitigate applies only if Bellevue Square terminates the lease rather than continue it. The court also noted the duty to mitigate is imposed by law regardless of whether it is included in the lease. As to the prohibition against consequential damages, the court found many of the harms asserted as a result of Whole Foods' default were "consequential and indirect damages under law, for which, pursuant to the Lease, Bellevue Square has waived the right to compensation." However, the court determined it could consider these harms for purposes of granting injunctive relief.

The court's interpretation of the limitations on Bellevue Square's remedies is inconsistent with the plain language of the lease. Section 10.1(c) states the limitations apply to the "Landlord's exercise of its rights and remedies at law or in equity upon the occurrence of an Event of Default." The limitations of section 10.1(c) apply whether Bellevue Square terminates or continues the lease. Further, contrary to the assertion by Bellevue Square at oral argument, section 10.1(c) is not limited to an anticipatory breach of the contract.

Regardless of whether Bellevue Square decided upon Whole Foods vacating the premises to either terminate or continue the lease, under the terms of the lease, Bellevue Square has the duty to mitigate damages   The lease expressly requires Bellevue Square to attempt to "relet" the premises.  The duty to mitigate damages is inconsistent with the trial court's conclusion that Bellevue Square is entitled to compel Whole Foods to continue operating.  For Bellevue Square to be able to lease the premises to another tenant, Whole Foods must be permitted to cease operating on the premises.

Nonetheless, Bellevue Square argues section 10.1(b)(ii) of the lease expressly makes specific performance an available remedy for Whole Foods' breach of the Tenant's Operating Covenant in section 7.2(b).  We reject this argument.  As previously noted, the Tenant's Operating Covenant has very specific and limited remedy provisions.

When Whole Foods vacated the premises, Bellevue Square elected under section 10.1(b)(ii) to continue the lease, entitling it to "recover the Rent, damages from Tenant's default or breach, and any other payments as they may become due hereunder."  This default remedy option contemplates an ongoing obligation on the part of the defaulting tenant to continue making the required payments to the landlord as those payments become due.  To protect the landlord from "further defaults" by the defaulting tenant, section 10.1(b)(ii) allows Bellevue Square to "specifically enforce Tenant's obligations hereunder and obtain injunctive relief from further defaults and breaches "[5]

---

[5] Emphasis added.

In other words, once there has been a tenant default entitling Bellevue Square to invoke the remedies provided under section 10.1 and Bellevue Square has elected to invoke its option to treat the lease as continuing, there is a continuing obligation on the part of the tenant to make requisite payments as they become due. Bellevue Square has the right under section 10.1(b)(ii) to seek specific performance of these continuing obligations in the event of further default by the tenant. But under the express terms of the lease, the right of Bellevue Square to specific performance and injunctive relief does not apply beyond the circumstances specifically described in section 10.1(b)(ii)

Because Bellevue Square is not entitled to specific performance of all of the terms of the lease, the court erred in concluding Bellevue Square established a clear legal right to a preliminary injunction and specific performance. The trial court found the indirect harms experienced by Bellevue Square are "difficult to quantify with reasonable certainty" and granted injunctive relief because "[n]o adequate remedy at law exists to compensate Bellevue Square." The language of the lease does not support the court's conclusion. Under section 10.1(c)(iv) of the lease, Bellevue Square explicitly waives its right to recover "any indirect or consequential damages" such as "loss in value of the Development, and/or lost profits."

Subject to the limitations stated in section 10.1(c), the lease gives Bellevue Square an adequate, complete, and speedy remedy for the harm caused by Whole Foods vacating the premises and it may continue the lease and continue to recover rent, damages, and other payments from Whole Foods. If Whole Foods defaults on the continuing payment obligations, Bellevue Square is entitled to seek specific

14

performance and injunctive relief based on these further defaults as authorized by section 10.1(c).

We conclude the court abused its discretion by entering a preliminary injunction ordering Whole Foods to reopen and continue operating. We reverse and remand.

WE CONCUR: