**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| FITNESS INTERNATIONAL, LLC, a California limited liability company,<br><br>Appellant,<br><br>v.<br><br>135th AND AURORA LLC, a Washington limited liability company,<br><br>Respondent. | No. 84333-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| FITNESS INTERNATIONAL, LLC, a California limited liability company,<br><br>Appellant,<br><br>v.<br><br>3922 SW ALASKA, LLC, a Washington limited liability company,<br><br>Respondent. | |

MANN, J. — On March 16, 2020, Governor Jay Inslee issued the first of several public health orders directing all nonessential businesses, including gyms and fitness centers, to immediately cease operating to prevent the spread of the 2019 novel coronavirus (COVID-19). While the initial closure was lifted in August 2020, a second closure occurred between November 2020 and January 2021.

As a result of the closure, Fitness International LLC (Fitness), sued two of its Seattle landlords for breach of lease. Fitness appeals the trial court's summary judgment dismissal of its claims. We affirm.

I

A

Fitness owns and operates LA Fitness health and fitness clubs across the nation. In 2005, Fitness entered into a 15-year lease of property located at 135th and Aurora Avenue North in Seattle owned by 135th and Aurora LLC (Aurora LLC, Aurora lease).[1] Fitness occupied and began operating a fitness center at the Aurora property on December 31, 2007.

In 2012, Fitness entered into a 20-year lease of property on 39th Avenue SW in Seattle, owned by 3922 Alaska LLC (Alaska LLC, Alaska lease) (collectively, the leases).[2] Fitness occupied and began operating a fitness center at the Alaska property on May 15, 2015.

Paragraph 1.9 of the Aurora lease provides that Fitness's "initial uses" of the premises "shall be for the operation of a health club and fitness facility," together with "ancillary" uses such as a pro shop selling apparel and fitness related items, vitamin and nutritional supplement sales, and food and beverage service for members. Under paragraph 8.1, Fitness was required to put the premises to this "initial uses" for one day.

---

[1] The Aurora lease also allowed for three separate options to extend the term of the lease for three consecutive five-year terms.
[2] The Alaska lease also allowed for three separate options to extend the term of the lease for three consecutive five-year terms.

After the required one-day initial use, Fitness was free, subject to some restrictions, to put the premises to any other lawful use.

Paragraph 1.9 of the Alaska lease similarly provides that Fitness's "primary uses" of the premises "shall be for the operation of a health club and fitness facility," together with "ancillary" uses such as a pro shop selling apparel and fitness related items, vitamin and nutritional supplement sales, and food and beverage service (including the sale of healthy and/or natural foods). Under the Alaska lease, Fitness was required to operate the premises for the "primary uses" for a period of 60 consecutive months. After the initial period Fitness was free, subject to some restrictions, to put the premises to any other lawful use.

Under both leases, Fitness is required to pay monthly rent "without demand, deductions, set-offs or counterclaims."

Both leases contain almost identical "force majeure" clauses. The Aurora lease provides:

> 22.3 FORCE MAJEURE. If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of strikes, lockouts, inability to procure labor or materials, failure of power, restrictive Laws, riots, insurrection, war, fire, severe and abnormal inclement weather or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed, financial inability excepted (any "Force Majeure Event"), performance of such act shall be excused for the period of the Force Majeure Event, and the period for the performance of such act shall be extended for an equivalent period. Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events.[3]

---

[3] The Alaska LLC Lease provides:

If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of strikes, lockouts, inability to procure labor or materials, retraction by any Governmental Authority of the Building Permit once it has already been

B

On March 16, 2020, Governor Inslee issued the first of several public health orders directing all nonessential businesses, including gyms and fitness centers, to immediately cease operating to prevent the spread of the COVID-19 virus (COVID-19 closure).  On August 10, 2020, the State permitted indoor clubs and gyms to operate under restricted guidelines.  Another COVID-19 closure occurred from November 17, 2020 to January 10, 2021.  It is undisputed that during these closure periods, it was illegal for Fitness to operate an in-person fitness club.  See Fitness Int'l, LLC v. Nat'l Retail Props., LP, 25 Wn. App. 2d 606, 611, 524 P.3d 1057 (Fitness I), review denied, 1 Wn.3d 1020 (2023).

Following the first closure, the parties amended both leases to address rent abatement and deferral (the amendments).  Aurora LLC and Alaska LLC (collectively landlords) agreed to defer rent or portions of rent for April, May, and June 2020, and to abate 50 percent of the rent for August and September 2020.  The amendments also provided the following, "[e]xcept as set forth in Sections 2 and 3 above, Tenant shall continue to pay all obligations under the Lease as and when due."

issued, failure of power, restrictive laws, riots, insurrection, war, fire, inclement weather or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed, financial inability excepted (each, a "Force Majeure Event"), subject to any limitations expressly set forth elsewhere in this Lease, performance of such act shall be excused for the period of delay caused by the Force Majeure Event and the period for the performance of such act shall be extended for an equivalent period (including delays caused by damage and destruction caused by such Force Majeure Event).  Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events.  Force Majeure Events shall also include, as applied to performance of Tenant's acts, hindrance and/or delays in the performance of Tenant's Work or Tenant obtaining certificates of occupancy or compliance for the Premises by reason of any of the following: (i) any work performed by Landlord in or about the Premises from and after Delivery (including, but not limited to, the completion of any items of Landlord's Work remaining to be completed); and/or (ii) the existence of Hazardous Substances in the Premises not introduced by Tenant.

In January 2021, Fitness sued the landlords asserting breach of contract for (1) breached representations, warranties, and covenants of use and quiet enjoyment, (2) failing to credit Fitness for rent paid during the closures, and (3) not proportionately abating rent during the closures. Fitness also sought a declaratory judgment that, among other things, it has no obligation to pay rent during the government mandated closures. The trial court granted the landlords' motion to consolidate the cases.

In cross motions for summary judgment, Fitness argued that the force majeure clause in the leases excused payment of rent for the second closure period. The landlords argued that the obligation to pay rent was not excused by the force majeure clause nor by frustration of purpose or impossibility. The landlords also asserted that by executing the amendments, Fitness waived its right to claim that its obligation to pay rent was excused. The trial court entered summary judgment in favor of the landlords and dismissed Fitness's claims.

Fitness appeals, challenging only its requirement to pay rent during the second COVID-19 closure.

II

This is an appeal from an order granting summary judgment. Our review is de novo, and we engage in the same inquiry as the trial court. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Young, 112 Wn.2d at 225. We construe the evidence and reasonable inferences in the light most favorable to the nonmoving party. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019).

"The interpretation of a lease is a question of law that this court reviews de novo." Bellevue Square, LLC v. Whole Foods Mkt. Pac. Nw., Inc., 6 Wn. App. 2d 709, 716-17, 432 P.3d 426 (2018). Our primary goal is to determine the parties' intent. Berg v. Hudesman, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). We determine the parties' intent by "focusing on the objective manifestation of the parties in the written contract." Bellevue Square, LLC, 6 Wn. App. 2d at 716 (citing Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). "Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Hearst, 154 Wn.2d at 503-04, 115 P.3d 262. "A contract should be construed as a whole and, if reasonably possible, in a way that effectuates all of its provisions." Bellevue Square, 6 Wn. App. 2d at 717, 432 P.3d 426 (internal quotation marks omitted).

A

Fitness argues first that the trial court erred in dismissing its claims because under the leases' force majeure clauses, rent was excused during government-mandated closure periods. Fitness contends that the COVID-19 closures were "restrictive laws" that "hindered" or "prevented" it from performing a required act: operate a health and fitness facility. While we agree that the COVID-19 closures were "restrictive laws," Fitness's argument that the closure excused its duty to pay rent fails.

Again, the force majeure clauses provide, in relevant part

> If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of . . . restrictive Laws . . . or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed, financial inability excepted (any "Force Majeure Event"), subject to any limitations expressly set forth elsewhere in this Lease,

performance of such act shall be excused for the period of the Force Majeure Event, and the period for the performance of such act shall be extended for an equivalent period. Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events.

Under its plain terms, the force majeure clause sets for three requirements for its invocation: (1) a party failed to perform an "act"; (2) performance of the act was "required" under the lease; and (3) the failure to perform the required act was caused by a "restrictive law" or other event listed in the force majeure clause.

Fitness focuses its argument on the leases' required act of operating a health club and fitness facility. But in addition to the required act of operating a health and club and fitness facility, the lease also separately required Fitness to pay monthly rent "without demand, deductions, set-offs or counterclaims." While the COVID-19 closures prohibited the operation of an in-person health club and fitness facility, nothing in the COVID-19 closures prohibited Fitness from paying the rent required under the lease. To the contrary, paragraph 5.3 of the leases expressly states:

> Throughout the Term of this Lease, except as specifically provided in this Lease or any exhibit attached hereto and subject to Tenant's Minimum Rent obligations commencing on the Rent Commencement Date as set forth in Section 5.1 above, Tenant shall pay to Landlord, without demand, deductions, set-offs or counterclaims, the "Rent", which is hereby defined as the sum of the Minimum Rent and all Additional Rent . . . when and as the same shall be due and payable hereunder.

(Emphasis added.) Nowhere in the lease does it specifically provide that rent is excused in the event of a force majeure event. Indeed, the force majeure clause excepts "financial inability" from the list of force majeure events and then expressly states that "Delays or failures to perform resulting from [a] lack of funds or which can be cured by the payment of money shall not be a Force Majeure Event[]."

In contrast with the force majeure clause, other clauses in the leases do specifically provide for nonpayment of rent. For example, in the Alaska lease, Fitness's requirement to pay rent is abated or reduced if the landlord causes a reduction or elimination of utility services:

> Notwithstanding anything to the contrary contained in this Lease, in the event of any failure, interruption or reduction in any utility service due to the negligence or willful misconduct of Landlord, its agents, employees or contractors, which failure, interruption or reduction renders the Premises wholly or partially untenable for the reasonable operation of Tenant's business therein for a period of twenty-four (24) consecutive hours after notice thereof to Landlord, Rent shall thereafter abate during such period of untenability in proportion to the degree to which Tenant's use of the Premises is impaired.

Because the leases do not specifically excuse the duty to pay rent during a force majeure event, the obligation to pay rent under paragraph 5.3 controls.

Fitness argues that the fundamental purpose of the lease is for Fitness to pay rent in exchange for operating a health club and fitness center. Fitness fails, however, to point to plain language in the leases stating that payment of rent is contingent on operating an in-person health club and fitness facility. But even if Fitness is correct, the force majeure clause does not protect Fitness's choice to operate in-person fitness facilities. Instead, the force majeure clause only protects Fitness from the "performance of any act <u>required</u>" under the lease. (Emphasis added.) Under the plain language of the leases, Fitness was not required to operate a health club and fitness facility during the second COVID-19 closure.

Under paragraph 8.1 of the Alaska lease, Fitness was required to conduct the "primary uses" for a period of 60 consecutive months. Fitness occupied and began operating a fitness center at the Alaska property on May 15, 2015. Thus, by May 2020,

Fitness's required "act" of operating the "primary uses" had expired. Similarly, under paragraph 8.1 of the Aurora lease, Fitness was only required to operate the identified "initial uses" of the premises for one day. Fitness's requirement to operate the Aurora lease's initial uses also had expired prior to the second COVID-19 closure.

Because Fitness was not required to operate a health club and fitness center during the second COVID-19 closure, and because the force majeure event did not make it illegal or impossible to pay rent, the force majeure provision does not excuse Fitness from the payment of rent during second COVID-19 closure.

B

Fitness also argues that the trial court erred in concluding that the landlords had not breached the leases' express covenants of quiet enjoyment. We disagree.

Fitness first points to the following nearly identical language in paragraph 1.9 of the leases. Paragraph 1.9 of the Alaska lease provides, in relevant part:

> Landlord hereby represents, warrants and covenants to Tenant that Tenant's operation of business from the Premises for Tenant's Primary Uses does not and will not violate any agreements respecting exclusive use rights or restrictions on use within the Project or any portion thereof.[4]

We agree with the trial court that the State's enactment of COVID-19 closures does not constitute a breach of the quoted portion of paragraph 1.9. The COVID-19 closures were not "an agreement" or "existing lease" "respecting exclusive use rights or restrictions within the Project." The COVID-19 closures were instead acts of the

---

4 The Aurora lease provides:

Landlord hereby represents and warrants to Tenant that the operation of business from the Premises for Tenant's Initial Uses will not violate any existing leases respecting exclusive use rights or restrictions on use within the Project or any portion thereof.

executive branch of the State of Washington.  Moreover, the COVID-19 closures did not concern "the Project," but all health clubs across the State of Washington.

Fitness points also to the following sentence in paragraph 1.9 of the Alaska lease (but not included in the Aurora lease):

> Tenant shall have the right throughout the Term to operate the Premises or any portion thereof, for uses permitted under the Lease.

But this portion of paragraph 1.9 cannot be read to impose an obligation on the landlord relating to any government orders, or guarantee that the government will never prohibit or restrict the type of business Fitness operates.  Moreover, even if this portion of paragraph 1.9 was read as some sort of warranty, the warranty would only cover "uses permitted under the Lease."  But under paragraph 8.3(3)(e) of the Alaska lease, Fitness covenanted that it would "not use or allow the Premises to be used for any illegal purposes."  Because operating a health and fitness center was illegal during the COVID-19 closures, the use was not "permitted under the Lease."

Fitness next argues that the landlords breached the representation, warranty, and covenant in paragraph 2.2(b) of the leases to peaceful and quiet enjoyment. Paragraph 2.2(b) provides:

> Landlord, hereby represents, warrants, and covenants to Tenant that:
>
> Landlord has good and insurable title to the Premises in fee simple, free and clear of all tenancies, covenants, conditions, restrictions, encumbrances and easements which might prevent or adversely affect the use of the Premises by Tenant for the Initial Uses, or disturb Tenant's peaceful and quiet possession and enjoyment thereof, and that there are, and will be at the Commencement Date no unrecorded or inchoate liens affecting the Premises. Landlord agrees to defend said title and represents and warrants that, so long as Tenant fulfills the material covenants and conditions of this Lease required by Tenant to be kept and performed, Tenant shall have, throughout the entire Term and any

extensions and renewals hereof, peaceful and quiet possession and enjoyment of the Premises without any ejection by Landlord or by any other person by, through or under Landlord.

Again, we agree with the trial court that paragraph 2.2(b) concerns the validity of the landlord's title to the premises, and guarantees that Fitness has a right to peaceful and quiet possession "without any ejection by Landlord or by any other person by, through or under Landlord." But Fitness does not allege that either landlord lacked good title, or that there were restrictions in place, when the leases were signed. The State's temporary COVID-19 closure was not a restriction on title, and was not an action by, through, or under the landlords—it was an action by state government.

The trial court did not err in dismissing Fitness's claims that the landlords were in breach of paragraphs 1.9 or 2.2 of the leases.

III

Fitness argues that the trial court erred by granting summary judgment and dismissing its claims for equitable relief under the doctrines of frustration of purpose, impossibility, and/or impracticability. We disagree.

"'[W]hether equitable relief is appropriate is a question of law that we review de novo.'" Fitness I, 25 Wn. App. 2d at 618 (quoting Borton & Sons, Inc. v. Burbank Props, LLC, 196 Wn.2d 199, 207, 471 P.3d 871 (2020)).

A

The doctrine of "discharge by supervening frustration" is recited in Restatement (Second) of Contracts § 265 (Am. L. Inst. 1981):

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract

-11-

was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

Wash. State Hop Producers, Inc., Liquidation Tr. v. Goschie Farms, Inc., 112 Wn.2d 694, 700, 773 P.2d 70 (1989). Under the Restatement, "the purpose that is frustrated must have been a principal purpose of that party in making the contract . . . without [which] the transaction would make little sense." RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a. See also Wash. State Hop Producers, 112 Wn.2d at 700. Performance is not excused unless the purpose is "substantially frustrated." Felt v. McCarthy, 130 Wn.2d 203, 207, 922 P.2d 90 (1996). "It is not enough that the transaction has become less profitable for the affected party or even that [it] will sustain a loss." Felt, 130 Wn.2d at 208.

While we agree that Fitness could not operate a traditional health and fitness center during the second COVID-19 closure, the 2-month closure did not substantially frustrate the primary purpose of the 15 to 20-year leases. Moreover, as we explained in our review of an almost identical lease in Fitness I, Fitness remained in possession of the leased premises and use of the premises for ancillary purposes was left broadly to Fitness's business judgment.

> Section 9.1 also lists more than a dozen possible ancillary uses that Fitness International can conduct, including selling apparel, wellbeing services, vitamins, and food and beverages. Use of the premises for ancillary purposes is left broadly to Fitness International's business judgment.

Fitness I, 25 Wn. App. 2d at 620. Here, like Fitness I, paragraph 1.9 of the Alaska lease authorized use of the leased premises for a long list of ancillary uses, "including, but not limited to, . . . food and beverage service (including the sale of healthy and/or natural

-12-

foods), as well as the sale of exercise and/or health related videos and/or DVDs and other related electronic media items."[5]

A lease is not substantially frustrated if the lease allows the tenant flexibility in its use of the premises. Fitness I, 25 Wn. App. 2d at 622. The trial court did not err in dismissing Fitness's frustration of purpose claim.[6]

B

"The doctrine of impossibility and impracticability discharges a party from contractual obligations when a basic assumption of the contract is destroyed and such destruction makes performance impossible or impractical, provided the party seeking relief does not bear the risk of the unexpected occurrence." Tacoma Northpark, LLC v. NW, LLC, 123 Wn. App. 73, 81, 96 P.3d 454 (2004). "The mere fact that a contract's performance becomes more difficult or expensive than originally anticipated, does not justify setting it aside." Liner v. Armstrong Homes of Bremerton, Inc., 19 Wn. App. 921, 926, 579 P.2d 367 (1978).

In Fitness I, impossibility did not discharge performance because:

Fitness International still occupied the premises, could conduct ancillary uses including, but not limited to, conducting online classes, and selling take-away food, or otherwise alter its business, and continue operations. The premises was not destroyed nor was Fitness International's exclusive

---

[5] Similarly, paragraph 1.9 of the Aurora lease provides:

Tenant may use portions of the Premises for uses ancillary to a health club and fitness facility, including, but not limited to, a pro shop (selling apparel and fitness related items), physical therapy center, sports medicine, weight loss advising and nutritional counseling and related programs, therapeutic massage, swim lessons, racquetball lessons, tanning salon, juice bar, vitamin and nutritional supplement sales, ATM machines, vending machines, child care facility for members and food and beverage service for members.

[6] Fitness asks us to adopt the doctrine of temporary frustration under Restatement (Second) of Contracts § 269. We decline to do so.

possession and use disturbed. The temporary public health closure orders limited Fitness International's use of the premises, but that is not sufficient.

25 Wn. App. 2d at 623.

Similarly, here, Fitness occupied the properties, could conduct ancillary uses, or otherwise alter its business.  The properties were not destroyed nor was Fitness's exclusive possession and use disturbed.  Because Fitness's performance was only limited and not made impossible or impracticable, Fitness is not discharged from its contractual obligation to pay rent.[7]  The trial court did not err in dismissing Fitness's impossibility claim.

We affirm.

_____
Mann, J.

WE CONCUR:

_____
Birk, J.

_____
Dwyer, J.

_____

[7] Because we affirm the trial court's dismissal of Fitness's claims, we do not reach the issue of whether, by executing the amendments, Fitness waived its right to dispute rent during the second closure period.