IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROIC WASHINGTON, LLC, a Delaware limited liability company,<br><br>                      Appellant,<br><br>      v.<br><br>R.F. EDMONDS JOINT VENTURE,<br><br>                     Respondent. | No. 83289-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, A.C.J. — This case involves interpretation of the bonus rent provision in a ground lease. A building in Edmonds straddles two parcels of land, of which ROIC Washington, LLC, owns the southern parcel and leases the northern parcel from R.F. Edmonds Joint Venture. ROIC in turn sublets the entire building to PCC Community Markets, which operates a grocery store. Under the ground lease governing ROIC's tenancy, a sum equal to 0.25 percent of the sales "from the leased premises" is payable to R.F. Edmonds as "bonus rent." ROIC and R.F. Edmonds's predecessors in interest under the lease have, since 1981, calculated bonus rent based on the total sales of the stores occupying the building. ROIC, in its first payment to R.F. Edmonds, prorated sales based on the percentage of the building located on R.F. Edmonds's parcel, and has subsequently paid more only in protest.

ROIC sued, asking the court to determine the appropriate method to calculate the bonus rent. After a bench trial, the trial court concluded in R.F.

Citations and pin cites are based on the Westlaw online version of the cited material.

Edmonds's favor. ROIC appeals. Because the trial court did not err in considering the parties' historical practices when interpreting the bonus rent provision, we affirm.

FACTS

The ground lease at the center of this case was created in 1978 by Albertsons Inc. and Robert Garbareno. It concerns the northernmost of three adjacent parcels of land located in the city of Edmonds on which Albertsons wished to, and eventually did, build and operate a grocery store. Garbareno owned the parcel relevant to the parties' current dispute, depicted below in an attachment to the ground lease as "Parcel I":



The lease sets out a two-pronged approach for the payment of rent. Once Albertsons opened its grocery store, annual minimum rent was $13,000, payable in monthly installments. But the bulk of the landlord's rental income comes from the second prong, which requires the tenant to pay "bonus rent" equal to 0.25 percent of yearly gross sales from the property, less the minimum base rent. Interpretation of the bonus rent provision and the interplay of the defined terms that it incorporates is the subject of this lawsuit.

Neither of the ground lease's drafting parties continues to have any interest in it. Albertsons assigned its rights and obligations under the lease to Newkirk Washtex L.P. upon the shopping center's opening in March of 1981 and became Washtex's subtenant. Albertsons stopped operating its grocery store in 2005, and was replaced in its subtenancy by Puget Consumers Co-op (PCC) the next year. Washtex sold its tenancy interests to ROIC, plaintiff in this case, in 2017. R.F. Edmonds, defendant in this case, purchased Parcel I and assumed landlord's interest in the ground lease in 1994.

Albertsons leased Parcel II, the other parcel on which it would build its shopping center, from Frank and Betty Wuscher. The terms of the Parcel II ground lease are in many respects identical to the terms of the Parcel I ground lease, though its bonus rent provision awards 0.3 percent to the landlords, rather than 0.25 percent.[1] ROIC purchased Parcel II in 2017, at the same time as it

---

[1] We refer to the Parcel I ground lease simply as "the ground lease" throughout this opinion. To avoid confusion, we will refer to the Parcel II ground lease as "the Parcel II ground lease."

3

purchased Washtex's interests in Parcel I under the ground lease.

Until ROIC assumed fee simple ownership of Parcel II and a tenancy interest in the ground lease, tenants and landlords alike had calculated bonus rent as 0.25 percent of the total sales of the grocery store on the premises— whether Albertson's or PCC. ROIC challenged this practice. It contended that bonus rent should instead be calculated based on the relative percent of the grocery store that sits on each parcel and when the time came for it to pay its first bonus rent it did so based on that proration. To determine how much of the shopping center sits on Parcel I and how much sits on Parcel II, ROIC commissioned a survey of the property. It found that 72.53 percent of the shopping center sits on Parcel I and calculated its bonus rent payment accordingly, paying 72.53 percent of 0.25 percent of the PCC's total sales to R.F. Edmonds.

R.F. Edmonds issued a notice of default to ROIC, which initiated this lawsuit by way of response. It requests declaratory relief interpreting the bonus rent provision of the ground lease. Both parties moved for summary judgment requesting resolution in their favor. Both were denied by the trial court for reasons it did not articulate. The matter proceeded to a bench trial. Because most facts were uncontested—including the history and language of the lease, historical patterns of payment, and the percentage of the store located on the two parcels—the parties submitted a joint statement of stipulated facts at the outset of proceedings. The court heard testimony about the stipulated facts, but also

4

heard testimony about the history of the parties and their dispute and about market rates of similar bonus rent provisions.

The trial court entered findings of fact and conclusions of law and issued a declaratory judgment in R.F. Edmonds's favor. ROIC appeals the declaratory judgment, assigning error only to its legal conclusions, rather than its factual findings.

ANALYSIS

Standard of Review

Absent factual disputes, we review matters of contract interpretation de novo. Keystone Masonry, Inc. v. Garco Const., Inc., 135 Wn. App. 927, 932, 147 P.3d 610 (2006). We also review legal conclusions made in declaratory judgments de novo. To-Ro Trade Shows v. Collins, 144 Wn.2d 403, 410, 27 P.3d 1149 (2001).

Where, however, extrinsic evidence—evidence other than the language of the contract itself—bears on the contract's interpretation, de novo review cannot be assumed. Washington follows RESTATEMENT (SECOND) OF CONTRACTS § 212 (AM. LAW INST. 1981). Berg v. Hudesman, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990). That section states:

> A question of interpretation of a[ contract] is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of a[ contract] is to be determined as a question of law.

RESTATEMENT § 212(b). A comment clarifies that

> a question of interpretation is not left to the trier of fact where the evidence is so clear that no reasonable person would determine the issue in any way but one. But if the issue depends on evidence

5

outside the writing, and the possible inferences are conflicting, the choice is for the trier of fact.

RESTATEMENT § 212 cmt. e.  The standard of review therefore depends on the nature of the evidence considered and whether, given that evidence, the contract may be reasonably interpreted in more than one way.

Here, ROIC urges us to apply de novo review, while R.F. Edmonds contends that we ought to review for sufficiency of the evidence, the form of review typically applied to disputed questions of fact.  We will review de novo for several reasons.  First, no extrinsic evidence is the subject of a credibility determination.  Though extrinsic evidence concerning the market rate of bonus rents could play a part in the analysis, its credibility does not appear to be contested, despite R.F. Edmonds's assertions to the contrary.  ROIC's framing of the case supports this conclusion; it urges us to apply de novo review, asserts that the material facts are undisputed, and assigns no error to any of the court's factual findings.  Additionally, though it argued against the market rate testimony's admissibility, ROIC did not present any countervailing evidence by which to create a dispute of fact.

Second, regardless of whether the market rate testimony is considered, extrinsic evidence about the parties' history of payments is sufficient to support only one reasonable interpretation of the contract.

<u>Interpretation of the Ground Lease</u>

The core legal dispute of this case involves the interpretation of the ground lease's use of "bonus rent."  ROIC contends that, because bonus rent is

calculated on the basis of "gross sales," a term defined to include sales from the "leased premises," which are in turn defined as Parcel I, rent should be prorated based on the relative square-footage of the shopping center that lies on Parcel I as opposed to Parcel II. R.F. Edmonds contends that bonus rent should be interpreted in accordance with the historical practices of the parties, including the drafters of the contract, and be calculated as a percent of the total sales from the shopping center as a whole. We agree with R.F. Edmonds.

1. Principles of Contract Interpretation

" 'The cardinal rule with which all [contract] interpretation begins is that its purpose is to ascertain the intention of the parties.' " Berg, 115 Wn.2d at 663 (quoting ARTHUR L. CORBIN, The Interpretation of Words and the Parol Evidence Rule, 50 Cornell L. Quar. 161, 162 (1965)). In service of this purpose, courts interpreting contracts take into account a broad range of factors, from the language of the contract to consideration of extra-contractual, extrinsic evidence. Berg, 115 Wn.2d at 666-68. Therefore, "[i]n discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor." Berg, 115 Wn.2d at 668. In contrast to the typical rule when interpreting statutes, "ambiguity in the meaning of contract language [need not] exist before evidence of the surrounding circumstances is admissible." Berg, 115 Wn.2d at 669. Berg, applying this rule, determined the intent of the parties in part by considering the

7

acceptance of payments from one party to another over a number of years.  115

Wn.2d at 677-78.

This case law aligns with the RESTATEMENT (SECOND) OF CONTRACTS,

§ 212(1) (AM. LAW INST. 1981), which was adopted as the law of Washington by

Berg and which states: "[t]he interpretation of [a contract] is directed to the

meaning of the terms of the writing or writings in the light of the circumstances."

Berg, 115 Wn.2d 667-78.

It is also consistent with the Uniform Commercial Code (UCC), Title 62A

RCW, adopted by statute in Washington, which states that "[a] course of

performance . . . between the parties . . . is relevant in ascertaining the meaning

of the parties' agreement."  RCW 62A.1-303(d).  In the terminology of the UCC, a

course of performance is

> a sequence of conduct between the parties to a particular
> transaction that exists if:
>
>     (1) The agreement of the parties with respect to the transaction
> involves repeated occasions for performance by a party; and
>
>     (2) The other party, with knowledge of the nature of the
> performance and opportunity for objection to it, accepts the
> performance or acquiesces in it without objection.

RCW 62A.1-303(a).  The comments to this section of Washington's codification

of the UCC clarify that "course of performance" is conduct "after or under" an

agreement.  RCWA 62A.1-303 cmt. 2 (Supp. 2022).

That the courts at times consider extrinsic evidence does not, however,

mean that they may place undue weight on it or consider it in all instances.

Extrinsic evidence may be used to determine the meaning of specific words and

terms, but not to demonstrate " 'an intention independent of the instrument,' " nor to " 'vary, contradict or modify the written word.' " Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005) (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)).  Further, because contracts are meant to express the shared intent of the parties, the subjective intent of the parties is not material.  Hearst Commc'ns, Inc., 154 Wn.2d at 503-04.  Instead, the courts seek to ascertain the "objective manifestation" of the parties' intent, imputing "an intention corresponding to the reasonable meaning of [the parties'] words and acts."  Dwelley v. Chesterfield, 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

2.  Relevant Provisions of the Ground Lease

A number of the ground lease's provisions are relevant to analysis of its use of the term "bonus rent."  First, and most obviously, is the lease's bonus rent provision itself: "Tenant shall also pay a bonus rent equal to one fourth of one percent *(1/4%)* of Gross Sales in each Fiscal Year less the minimum annual rent for that Fiscal Year."[2]

The ground lease defines "Gross Sales," in relevant part, as:

The sum of all items included in Subsection A less the sum of all items included in Subsection B.

  A.  Items included in Gross Sales:

      1.  Monies received for the sales of goods by Tenant or subtenants to retail customers from the leased premises.

---

[2] Italics indicates handwritten interlineation amending the otherwise typewritten ground lease.

9

  2. Net commissions to Tenant for issuance of money orders from the leased Premises.

  3. Net receipts to Tenant from vending machines, and fees from licensees and concessionaires allowed by Tenant on the Leased Premises.

[Subsection B excluded]

No portion of the lease defines what constitutes a sale "from" or "on" the leased premises, much less what the difference in the use of the two prepositions might entail, if anything. The inconsistent capitalization of "Leased Premises" is in the original ground lease, and is presumably inadvertent.

The ground lease defines "Leased Premises" as "[t]hat certain property together with all buildings and improvements thereon located in the City of Edmonds, County of Snohomish, State of Washington more particularly described in Schedule I attached hereto, and shown as Parcel I on the plot plan attached hereto as Exhibit 'A'." Exhibit A is included above in this opinion's facts section; Schedule I was either not attached to the final contract, or was not entered into evidence at trial.[3] The ground lease's definition of "Leased

---

[3] At argument, and in a subsequent letter to the court, ROIC pointed to the Schedule I attached to the Parcel II ground lease as proof of what the Parcel I ground lease's schedule describes. R.F. Edmonds, in a responsive letter, objects to ROIC's submission, as well as its submission of two statements of additional authorities filed before argument.

The rules of appellate procedure (RAP) limit a parties' submissions to the court. RAP 10.1 permits the appellant and respondent to file briefs, and permits the appellant to file an additional reply brief. RAP 10.1(b). The respondent may file a reply brief if cross-appealing. RAP 10.1(c). The court may allow amici curiae to file briefs, and may allow "on its own motion or on motion of a party" any additional briefing. RAP 10.1(h). Parties may also file statements of additional authorities not to exceed 350 words, and which include argument explaining the reason for the authorities and a pertinent pinpoint citation. RAP 10.8(a), (b). The court may strike, order modified, or accept an improperly submitted brief. RAP 10.7.

Premises" stands in contrast to its use of "Tenant's Adjoining Parcel" to identify Parcel II, and "Shopping Center" as "[t]he real property comprising the Leased Premises and Tenant's [A]djoining Parcel."

Use of the term "Leased Premises" throughout the contract is generally consistent with its defined meaning. For instance, provisions on disposition of property upon termination of the lease dictate that "Tenant shall deliver to Landlord a deed transferring title to any building improvements on the Leased Premises to Landlord." Similarly, "[u]pon the termination of this Ground Lease, fee title to all improvements then located on the Leased Premises shall pass to and vest in Landlord."

Proration is mentioned only once in the contract, in the context of termination of the lease prior to the end of its term. In such an event, minimum and bonus rent are to be prorated to the date of termination.

3. Application of Principles to the Ground Lease

The ground lease calculates bonus rent as a percentage of gross sales, and gross sales include sales "from" and, in the case of sales from licensees and concessionaires, "on" the leased premises, i.e., Parcel I. But the lease does not define what sort of sale occurs from or on Parcel I. In the context of the ground lease—which clearly anticipates the bulk of rent being bonus rent—this is a

---

That ROIC is here promoting consideration of extrinsic evidence while opposing it elsewhere is an irony not lost on us. Regardless, ROIC's letter to the court is improper, and impermissible without our approval. We do not grant that approval because the letter itself falls outside the normal appellate rules, the evidence it references is already in the record, and that evidence does not affect our decision.

conspicuous absence. This absence runs contrary to ROIC's assertion that the contract is clear on its face and that extrinsic evidence should play no role in its interpretation.

The absence means that the phrase "bonus rent" could be given a number of reasonable constructions when considered solely within the four corners of the contract. Perhaps any good that is stored on Parcel I is sold from or on that parcel. On the other hand, perhaps a sale only occurs from or on Parcel I if cash registers, and thus the exchange of currency for goods, are located on the parcel. Either interpretation becomes problematic both as a practical matter—tracking storage and sale of goods would become complex—and because the tenant could exploit these definitions by, for example, storing the most expensive items on Parcel II, or by placing all registers on Parcel II. Given those issues, perhaps either condition is sufficient. Or perhaps, because the whole of a grocery store can be reasonably construed to further the purpose of sales on the entire premises, any sale made by the store is from or on Parcel I. ROIC's interpretation of choice—proration based on the relative square footage of the building on the two parcels—is similarly reasonable, and certainly more workable than some other solutions.

While it might be one among several reasonable interpretations within the confines of the ground lease, however, ROIC's interpretation becomes unreasonable when viewed in light of extrinsic evidence. The most prominent piece of extrinsic evidence is that the parties who drafted and signed the lease

calculated bonus rent based on the total sales from the grocery store for the duration of their landlordship and tenancy. This strongly indicates that their intent in drafting the bonus rent provision was that it be read in precisely that manner.

As a result, it is reasonable to construe the confusion caused by incorporation of the term "Leased Premises" into "bonus rent" as inadvertent— the result of a simple oversight. The parties' interlineation of "1/4%," inconsistent use of capitalization of "Leased Premises," and the apparent exclusion of an appended "Schedule I" to the contract all indicate that such an oversight is likely. When drafting the bonus rent provision, the original parties to the ground lease may have failed to realize that "leased premises" was incorporated into "bonus rent" via "gross sales"—a definitional Russian doll.

This understanding of the lease is reinforced by trial testimony from Brian Bonipart, an expert witness for R.F. Edmonds. He testified that bonus rent provisions are typical in a number of types of commercial lease, especially leases for grocery stores and drug stores. Based on his 30 years of experience working with commercial leases, Bonipart reported that a typical bonus rent percentage is around 1.5 percent, without much variability store by store. He denied ever seeing a bonus rent provision as low as that at issue in this case, 0.25 percent. He also denied that the general rate had changed much, if at all, in his time in the industry, though he acknowledged he had no actual knowledge of market rates in the 1970s, when the ground lease at issue here was drafted and signed. Still, he

had worked with leases from the 1970s that contained bonus rent provisions at rates between 1 percent and 1.5 percent.

On the whole, this testimony supports R.F. Edmonds's reading of the ground lease's bonus rent provision. The 0.25 percent bonus rent rate in the ground lease is well below market rate and to prorate it would cause an even more significant deviation. Given the 0.3 percent bonus rent provision that was included in the Parcel II ground lease, the parties appear to have already contemplated the complexities of dividing bonus rent when a store sits on two separately owned parcels of land and decided to compensate not by proration, but by determining that they would require lower than market rate bonus rent for the two parcels. If their intent had been to prorate sales, they could have included a provision to that end in the ground lease—the existence of another proration provision indicates they were aware of the concept—and ROIC would not, presumably, have had to conduct its own survey of the square footage of the grocery store that falls on Parcel I as opposed to Parcel II.[4]

ROIC cites to cases holding that the same language used in different places in a contract is presumed to have the same meaning absent contrary intent. See, e.g., Black v. Nat'l Merit Ins. Co., 154 Wn. App. 674, 681-82, 226

---

[4] ROIC contends that reading the bonus rent provision in this way "cannot be reconciled with [the ground lease's] express terms without erroneously equating *Leased Premises* with *Shopping Center*," altering the meaning of other contractual terms that use "leased premises." But the contract's lack of clarity is not located in the phrase "leased premises." It exists only in the use of that phrase—via the intermediary phrase "gross sales"—in the bonus rent provision itself.

P.3d 175 (2010) ("In the absence of anything in the context of a contract clearly indicating a contrary intent, when the same word is used in different parts of the contract, it will be presumed to be used in the same sense throughout the contract.") (quoting Holter v. Nat'l Union Fire Ins. Co., 1 Wn. App. 46, 50, 459 P.2d 61 (1969)). ROIC correctly states this reasonable interpretive principle. Here, however, reading the bonus rent provision and the incorporated "leased premises" term as ROIC urges would be unreasonable, which demonstrates contrary intent, and the presumption is therefore rebutted. Applying the presumption would require us to conclude that the contract drafters, despite intending proration of payment based on square footage of the parcels, neglected to include language saying so even though the bonus rent payment provision is arguably the most important section of the contract, furnishing most of the landlord's consideration. The absence of such language constitutes their contrary intent—that payment not be prorated.

For these reasons, we conclude that bonus rent under the ground lease can only be reasonably interpreted to be calculated based on total sales, not prorated based on the relative square footage of the store on the two parcels.

Attorney Fees

Where applicable law grants a party the right to recovery of reasonable attorney fees, RAP 18.1(a) provides the appellate courts authority to award those fees on appeal. The ground lease at issue in this case states: "[i]f either party to this Lease is required to initiate or defend litigation in any way connected with

this Lease, the prevailing party in such litigation . . . shall be entitled to a reasonable attorneys' fee." It further states that "[a]ttorneys' fees shall include attorneys' fees on any appeal." Based on this the trial court properly awarded attorney fees to R.F. Edmonds, the prevailing party. We likewise award R.F. Edmonds its attorney fees on appeal.

We affirm.

Smith, A.C.J.

WE CONCUR:

Chung, J.